ORAL ARGUMENT NOT YET SCHEDULED

## No. 13-7171

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

YASSER ABBAS,
*Plaintiff-Appellant,*

v.

FOREIGN POLICY GROUP, LLC and JONATHAN SCHANZER,
*Defendants-Appellees*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Case No. 12-CV-01565 (Hon. Emmet G. Sullivan)

## BRIEF OF *AMICI CURIAE* MEDIA ORGANIZATIONS
## IN SUPPORT OF DEFENDANTS-APPELLEES

LAURA R. HANDMAN
ALISON SCHARY
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue, NW
Suite 800
Washington, DC 20006
Tel.: (202) 973-4200
Fax: (202) 973-4499

THOMAS R. BURKE
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street
Suite 800
San Francisco, CA 94111
Tel.: (415) 276-6500
Fax: (415) 276-6599

*Counsel for Amici Curiae*

April 2, 2014

## OF COUNSEL

Richard A. Bernstein
SABIN, BERMANT & GOULD LLP
4 Times Square, 23rd Floor
New York, NY 10036
*Counsel for Advance Publications, Inc.*

Kevin M. Goldberg
FLETCHER, HEALD & HILDRETH
1300 North 17th Street, 11th Floor
Arlington, VA 22209
*Counsel for the American Society
of News Editors and the
Association of Alternative Newsmedia*

Karen Kaiser
THE ASSOCIATED PRESS
450 West 33rd Street
New York, NY 10001
*Counsel for The Associated Press*

Jonathan Bloom
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
*Counsel for The Association of
American Publishers, Inc.*

Randy L. Shapiro
BLOOMBERG L.P.
731 Lexington Avenue
New York, NY 10022
*Counsel for Bloomberg L.P.*

Jonathan D. Hart
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004
*Counsel for the Center for Public
Integrity, the Online News Association
and the Online Publishers Association*

Mark H. Jackson
Jason P. Conti
Jacob P. Goldstein
DOW JONES & COMPANY, INC.
1211 Avenue of the Americas
New York, NY 10036
*Counsel for Dow Jones & Company,
Inc.*

Oscar Grut
THE ECONOMIST GROUP
20 Cabot Square
London E14 4QW
United Kingdom
*Counsel for The Economist Group*

David Giles
THE E.W. SCRIPPS COMPANY
312 Walnut Street, Suite 2800
Cincinnati, OH 45202
*Counsel for The E.W. Scripps Company*

Susan E. Seager
FOX ENTERTAINMENT GROUP, INC.
2121 Avenue of the Stars, Suite 700
Los Angeles, CA 90067
*Counsel for Fox Entertainment Group, Inc.*

Barbara W. Wall
GANNETT CO., INC.
7950 Jones Branch Drive
McLean, VA 22107
*Counsel for Gannett Co., Inc.*

Jonathan Donnellan
Kristina Findikyan
HEARST CORPORATION
300 West 57th Street, 40th Floor
New York, NY 10019
*Counsel for Hearst Corporation*

Karole Morgan-Prager
Juan Cornejo
THE MCCLATCHY COMPANY
2100 Q Street
Sacramento, CA 95816
*Counsel for The McClatchy Company*

Sandra S. Baron
Kathleen A. Hirce
MEDIA LAW RESOURCE CENTER
520 Eighth Avenue
North Tower — 20th Floor
New York, NY 10018
*Counsel for Media Law Resource Center*

Charles D. Tobin
HOLLAND & KNIGHT LLP
800 17th Street NW, Suite 1100
Washington, DC 20006
*Counsel for The National Press Club*

Mickey H. Osterreicher
NATIONAL PRESS PHOTOGRAPHERS
ASSOCIATION
1100 M&T Center
3 Fountain Plaza
Buffalo, NY 14203
*Counsel for National Press Photographers Association*

Greg Lewis
Denise Leary
Ashley Messenger
NATIONAL PUBLIC RADIO, INC.
1111 North Capitol Street NE
Washington, DC 20002
*Counsel for National Public Radio, Inc.*

Susan Weiner
NBCUNIVERSAL MEDIA LLC
30 Rockefeller Plaza
New York, NY 10112
*Counsel for NBCUniversal Media LLC*

David E. McCraw
THE NEW YORK TIMES COMPANY
620 Eighth Ave.
New York, NY 10018
*Counsel for The New York Times Company*

Mark H. Jackson
NEWS CORPORATION
1211 Avenue of the Americas
New York, NY 10036
*Counsel for News Corporation*

Kurt Wimmer
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004
*Counsel for Newspaper
Association of America*

Richard J. Tofel
PROPUBLICA
55 Broadway, 23rd Floor
New York, NY 10006
*Counsel for Pro Publica, Inc.*

Bruce D. Brown
Gregg P. Leslie
THE REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1101 Wilson Blvd., Suite 1100
Arlington, VA 22209
*Counsel for Reporters Committee for
Freedom of the Press*

Gail Gove
REUTERS AMERICA LLC
3 Times Square
New York, NY 10036
*Counsel for Reuters*

Bruce W. Sanford
Laurie A. Babinski
BAKER & HOSTETLER LLP
1050 Connecticut Avenue, NW
Suite 1100
Washington, DC 20036
*Counsel for Society of Professional
Journalists*

Karen H. Flax
Julie Xanders
Ed Lazarus
TRIBUNE COMPANY
435 North Michigan Avenue
Chicago, IL 60611
*Counsel for Tribune Company*

John B. Kennedy
James A. McLaughlin
THE WASHINGTON POST
1150 15th Street, NW
Washington, DC 20071
*Counsel for The Washington Post*

# CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

## A.    Parties and Amici

All parties, intervenors, and *amici* appearing in this Court are listed in the Brief for Defendants-Appellees and the Brief for Plaintiff-Appellant, except for additional *amici curiae* Advance Publications, Inc., American Society of News Editors, The Associated Press, Association of Alternative Newsmedia, The Association of American Publishers, Bloomberg L.P., Center for Public Integrity, Dow Jones & Company, Inc., The Economist Newspaper Limited, The E.W. Scripps Company, Fox Entertainment Group, Inc., Gannett Co., Inc., Hearst Corporation, The McClatchy Company, Media Law Resource Center, The National Press Club, National Press Photographers Association, National Public Radio, Inc., NBCUniversal Media LLC, News Corporation, The New York Times Company, Newspaper Association of America, Online News Association, Online Publishers Association, ProPublica, Reporters Committee for Freedom of the Press, Reuters America LLC, Society of Professional Journalists, Tribune Company, The Washington City Paper, and The Washington Post (collectively, "Media Amici"), and *amicus* the District of Columbia.

i

## B.    Rulings Under Review

References to the rulings at issue appear in the Brief for Defendants-Appellees and the Brief for Plaintiff-Appellant.

## C.    Related Cases

Pursuant to Circuit Rule 28(a)(1)(C), counsel for *amici* state that they are not aware of any related cases pending in this Court, any other Court of Appeals, or any other court within the District of Columbia.

## CORPORATE DISCLOSURE STATEMENTS

Under Circuit Rule 29(b), Rules 26.1 and 29(c)(1) of the Federal Rules of Appellate Procedure, and Circuit Rule 26.1, undersigned counsel for *amici curiae* provide the following disclosures of corporate identity:

**Advance Publications, Inc**. has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

The **American Society of News Editors** is a private, non-stock corporation that has no parent.

**The Associated Press** has no parent corporation and no publicly held company owns more than 10% of its stock.

The **Association of Alternative Newsmedia** has no parent corporation and does not issue any stock.

**The Association of American Publishers** is a nonprofit corporation that has no parent company and issues no stock.

**Bloomberg L.P**. is a privately held company.

The **Center for Public Integrity** is a nonprofit organization. It has no parent company and issues no stock.

**Dow Jones & Company, Inc.** ("Dow Jones") discloses that News Corporation, a publicly held company, is the indirect parent corporation of

iii

Dow Jones. Ruby Newco, LLC, a subsidiary of News Corporation and a non-publicly held company, is the direct parent of Dow Jones. No publicly held company owns 10% or more of the stock of Dow Jones.

**The Economist Newspaper Limited** ("The Economist") is a U.K. corporation. Fifty percent of its stock is owned by The Financial Times Limited ("FT"), a U.K. publicly held corporation. FT is a subsidiary of Pearson PLC, a U.K. publicly held corporation.

**The E.W. Scripps Company** is a publicly traded corporation. It has no parent corporation, and no publicly owned company owns 10% or more of its stock.

**Fox Entertainment Group, Inc.** ("Fox") is a wholly owned, indirect subsidiary of Twenty-First Century Fox., Inc., a publicly held company. No publicly held company owns 10% or more of Twenty-First Century Fox, Inc.

**Gannett Co., Inc.** is a publicly traded company and has no affiliates or subsidiaries that are publicly owned. No publicly held company holds 10% or more of its stock.

**Hearst Corporation** is a diversified, privately held media company. No publicly held company owns 10% or more of its stock.

**The McClatchy Company** is a publicly owned corporation.

iv

The **Media Law Resource Center** has no parent corporation and issues no stock.

The **National Press Club** is a not-for-profit corporation that has no parent company and issues no stock.

The **National Press Photographers Association** is a 501(c)(6) nonprofit organization that has no parent company and issues no stock.

**National Public Radio, Inc**. is a privately supported, not-for-profit membership organization that has no parent company and issues no stock.

**NBCUniversal Media, LLC** is indirectly owned by Comcast Corporation. Comcast Corporation is a publicly held corporation. No other publicly held corporation owns 10% or more of the equity of NBCUniversal Media, LLC.

**News Corporation** has no parent company and no publicly held company owns 10% or more of its shares.

**The New York Times Company** is a publicly traded company and has no affiliates or subsidiaries that are publicly owned. No publicly held company owns 10% or more of its stock.

v

The **Newspaper Association of America** is a non-stock corporation with no parent corporation, and no publicly held corporation owns 10% or more of any form of interest in it.

The **Online News Association** is a nonprofit organization. It has no parent company and issues no stock.

The **Online Publishers Association** is a nonprofit organization. It has no parent company and issues no stock.

**Pro Publica, Inc.** is a Delaware non-stock, nonprofit corporation.

The **Reporters Committee for Freedom of the Press** is an unincorporated association of reporters and editors with no parent corporation and no stock.

**Reuters America LLC** is an indirect wholly-owned subsidiary of Thomson Reuters Corporation, a publicly held company. No publicly held company owns 10% or more of the stock of Thomson Reuters Corporation.

The **Society of Professional Journalists** is a 501(c)(3) nonprofit organization with no parent company and no stock.

**Tribune Company** is a privately held company.

D.C. Communications, Inc., d/b/a **Washington City Paper**, is a wholly owned subsidiary of Southcomm Communications, a privately held company.

vi

Nash Holdings LLC is the sole parent of WP Company LLC (d/b/a **The Washington Post**).  Nash Holdings LLC is privately held and does not have any outstanding securities in the hands of the public.

Under Circuit Rule 26.1(b), the general nature and purpose of the Media Amici is to gather and disseminate the news, and to advocate for robust First Amendment and other legal protections for journalists and the news media.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES ................. i

CORPORATE DISCLOSURE STATEMENTS ....................................................... iii

TABLE OF AUTHORITIES ................................................................................. ix

GLOSSARY ........................................................................................................ xv

STATUTES AND REGULATIONS ..................................................................... xv

IDENTITY AND INTEREST OF AMICI ............................................................. 1

ARGUMENT ....................................................................................................... 2

    A.   D.C.'s Anti-SLAPP Act Broadly Applies to Claims Against the Media That Target the Exercise of Free Speech on Issues of Public Interest .................................................................................... 5

    B.   The D.C. Act, Like Other Anti-SLAPP Laws, Provides Substantive Protections That Protect the Media's Publication of News on Matters of Public Concern ........................................... 12

    C.   This Case Bears Out Media Amici's Experience that Anti-SLAPP Laws Supplement, Rather than Supplant, the Procedures Under the Federal Rules for Disposing of Meritless Libel Claims ................... 27

CONCLUSION .................................................................................................. 30

CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(a)(5)-(7) ........................................................... 31

ADDENDUM: DESCRIPTIONS OF *AMICI CURIAE* ..................................... 32

# TABLE OF AUTHORITIES

**Page(s)**

### Federal Cases

*3M Co. v. Boulter,*
  842 F. Supp. 2d 85 (D.D.C. 2012) ...................................................................4, 26

*Abbas v. Foreign Policy Grp., LLC,*
  ---F. Supp. 2d ---, 2013 WL 5410410 (D.D.C. Sept. 27, 2013) ..........................20

*Adelson v. Harris,*
  --- F. Supp. 2d ---, 2013 WL 5420973 (S.D.N.Y. Sept. 20, 2013),
  *appeal docketed,* No. 13-4173 (2d Cir. Oct. 31, 2013)...........................................24

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,*
  421 U.S. 240 (1975) ...........................................................................................18

*Armington v. Fink,*
  2010 WL 743524 (E.D. La. Feb. 24, 2010) ..........................................................23

*Aronson v. Dog Eat Dog Films, Inc.,*
  738 F. Supp. 2d 1104 (W.D. Wash. 2010).............................................................25

*Batzel v. Smith,*
  333 F.3d 1018 (9th Cir. 2003) ............................................................................14

*\*Boley v. Atlantic Monthly Grp.,*
  950 F. Supp. 2d 249 (D.D.C. 2013)......................................................4, 10, 22, 23

*\*Burke v. Air Serv Int'l,*
  685 F.3d 1102 (D.C. Cir. 2012)..................................................................3, 14, 17

*Burlington Northern R.R. Co. v. Woods,*
  480 U.S. 1 (1987).................................................................................................12

*CanaRx Servs. v. LIN Television Corp.,*
  2008 WL 2266348 (S.D. Ind. May 29, 2008) ......................................................25

---

\* Authorities upon which we chiefly rely are marked with an asterisk.

*Chapin v. Knight-Ridder, Inc.*,
993 F.2d 1087 (4th Cir. 1993) ...............................................................29

*Cibenko v. Worth Publishers, Inc.*,
510 F. Supp. 761 (D.N.J. 1981) ............................................................29

*Coles v. Washington Free Weekly*,
881 F. Supp. 26 (D.D.C. 1995), *aff'd*, 88 F.3d 1278 (D.C. Cir. 1996) ...................7

*Critical Care Diagnostics, Inc. v. American Ass'n for Clinical Chemistry, Inc.*,
2014 WL 842951 (S.D. Cal. Mar. 4, 2014) ...........................................24

*DC Comics v. Pac. Pictures Corp.*,
706 F.3d 1009 (9th Cir. 2013) ..............................................................14

*Dean v. NBCUniversal*,
No. 12 Civ. 00283 (D.D.C. filed Feb. 21, 2012) ..............................11, 26

*\*Farah v. Esquire Magazine*,
736 F.3d 528 (D.C. Cir. 2013) ................................................6, 22, 28

*\*Farah v. Esquire Magazine*,
863 F. Supp. 2d. 29 (D.D.C. 2012), *aff'd*, 736 F.3d 528 (D.C. Cir. 2013) ............................................................................4, 10, 22

*Forras v. Rauf*,
No. 12 Civ. 282, ECF No. 2-3 (D.D.C. filed Mar. 22, 2012) ...............26

*Four Navy Seals v. Associated Press*,
413 F. Supp. 2d 1136 (S.D. Cal. 2005) ................................................24

*Gardner v. Martino*,
563 F.3d 981 (9th Cir. 2009) ................................................................14

*\*Godin v. Schencks*,
629 F.3d 79 (1st Cir. 2010) ..............................................13, 15, 16, 17, 18

*Henry v. Lake Charles Am. Press, LLC*,
566 F.3d 164 (5th Cir. 2009) .........................................................15, 16

*Hilton v. Hallmark Cards,*
  599 F.3d 894 (9th Cir. 2010) ...............................................................14, 20

*Intercon Solutions, Inc. v. Basel Action Network,*
  2013 WL 4552782 (N.D. Ill. Aug. 28, 2013), *appeal docketed,*
  No. 13-3148 (7th Cir. Sept. 30, 2013) ...............................................15

*Levin v. McPhee,*
  119 F.3d 189 (2d Cir. 1997) ...............................................................29

*Liberty Synergistics Inc. v. Microflo Ltd.,*
  718 F.3d 138 (2d Cir. 2013) ...........................................................15, 16

*\*Makaeff v. Trump Univ., LLC,*
  736 F.3d 1180 (9th Cir. 2013) ...................................... 13, 15, 16, 18, 20, 26

*Makaeff v. Trump University, LLC,*
  715 F.3d 254 (9th Cir. 2013) ...............................................................15

*Milam v. State Farm Mut. Auto Ins. Co.,*
  972 F.2d 166 (7th Cir. 1992) ...............................................................16

*New York Times v. Sullivan,*
  376 U.S. 254 (1964).............................................................................5

*Northon v. Rule,*
  409 F. App'x 146 (9th Cir. 2011) ........................................................23

*Northon v. Rule,*
  637 F.3d 937 (9th Cir. 2011) ..........................................................14, 23

*Ollman v. Evans,*
  750 F.2d 970 (D.C. Cir. 1984) (en banc) ..............................................6

*Phantom Touring, Inc. v. Affiliated Publ'ns,*
  953 F.2d 724 (1st Cir. 1992)................................................................29

*Partington v. Bugliosi,*
  56 F.3d 1147 (9th Cir. 1995) ...............................................................29

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.,*
    559 U.S. 393 (2010) ............................................................... 13, 14

*Sherrod v. Breitbart,*
    843 F. Supp. 2d 83 (D.D.C. 2012),
    *aff'd*, 720 F.3d 932 (D.C. Cir. 2013) ............................................. 4, 11

*Thomas v. L.A. Times Commc'ns LLC,*
    189 F. Supp. 2d 1005 (C.D. Cal. 2002), *aff'd*, 45 F. App'x 801
    (9th Cir. 2002) ............................................................................. 23

*\*U.S. ex rel. Newsham v. Lockheed Missiles & Space Co.,*
    190 F.3d 963 (9th Cir. 1999) ......................................... 14, 15, 17, 25

*United States v. One Parcel of Property Located at 414 Kings Highway,*
    1999 WL 301704 (D.D.C. May 11, 1999) ........................................ 18

*Walker v. Armco Steel Corp.,*
    446 U.S. 740 (1980) ............................................................... 13, 14

*Washington Post Co. v. Keogh,*
    365 F.2d 965 (D.C. Cir. 1966) ......................................................... 6

**State Cases**

*Dean v. NBCUniversal,*
    No. 2011-CA-006055-B (D.C. Super. Ct. Nov. 14, 2012), *appeal
    pending*, No. 12 Civ. 1177 (D.C. Ct. App.) (argued Jan. 7, 2014) ...................... 11

*Dixon v. Superior Court,*
    30 Cal. App. 4th 733 (1994) ........................................................... 21

*Doe v. Burke,*
    No. 2012-CA-7525-B (D.C. Super. Ct. Jan. 30, 2013), *appeal
    pending*, No. 13 Civ. 83 (D.C. Ct. App.) (argued Jan. 29, 2014) ...................... 12

*Lafayette Morehouse, Inc. v. Chronicle Publ'g Co.,*
    37 Cal. App. 4th 855 (1995) ..................................................... 10, 21

*Lehan v. Fox Television Stations, Inc.,*
    2011 D.C. Super. LEXIS 14 (D.C. Super. Ct. Nov. 30, 2011) ...................... 11

*Mann v. Nat'l Review, Inc.,*
No. 2012-CA-008263-B, 2013 D.C. Super. LEXIS 8
(D.C. Super. Ct. July 19, 2013) ................................................................12

*Myers v. Plan Takoma,*
472 A.2d 44 (D.C. 1983) .........................................................................7

*Snyder v. Creative Loafing, Inc.,*
No. 2011-CA-003168-B (D.C. Super. Ct. filed Apr. 26, 2011) .............11

**State Statutes**

*D.C. Code § 16-5501 *et seq.* ................................ 1, 2, 3, 4, 5, 6, 7, 8, 9, 14, 19, 26, 30

**Rules**

Fed. R. Civ. P. 12 ........................................................................7, 13, 17, 20, 22, 24

Fed. R. Civ. P. 56 ............................................................................13, 17, 22, 23

**Legislative Material**

Council of the D.C. Committee on Public Safety and the Judiciary,
Report on Bill 18-893, "Anti-SLAPP Act of 2010" (Nov. 18, 2010) ...................2

**Other Authorities**

Bruce E.H. Johnson & Sarah K. Duran, *A View from the First
Amendment Trenches: Washington State's New Protections for Public
Discourse & Democracy,* 87 Wash. L. Rev. 495 (June 2012) ...............................19

Colin Quinlan, *Erie and the First Amendment: State Anti-SLAPP Laws
in Federal Court After Shady Grove,* 114 Colum. L. Rev. 367 (2014) ..................14

Eliza Krigman, *Yelp Pushes for Federal Anti-SLAPP Laws,* Politico
(Jan. 4. 2013), http://www.politico.com/story/2013/01/yelp-
pushes-for-federal-anti-slapp-laws-85737.html ...............................................26

George W. Pring, *SLAPPs: Strategic Lawsuits against Public
Participation,* 7 Pace Envtl. L. Rev. 3 (1989).....................................................10

Josh Gerstein, *Charity Drops Suit against Terrorism Analyst*, New York Sun (Aug. 16, 2007), *available at* http://www.nysun.com/national/charity-drops-suit-against-terrorism-analyst/60635/ ...................................................................19

Robert D. Richards, *A SLAPP in the Facebook: Assessing the Impact of Strategic Lawsuits Against Public Participation on Social Networks, Blogs & Consumer Gripe Sites*, 21 DePaul J. Art Tech. & Intell. Prop. L. 221 (Spring 2011) ...................................................................18

Thomas R. Burke, Anti-SLAPP Litigation (The Rutter Group 2013) .............10, 12

## GLOSSARY

"SLAPP" stands for Strategic Lawsuits Against Public Participation.

"Act" or "Anti-SLAPP Act" stands for the District of Columbia's Anti-SLAPP Act of 2010, D.C. Code § 16-5501 *et seq.*

"Committee Report" stands for the Report on Bill 18-893, "Anti-SLAPP Act of 2010," Council of the D.C. Committee on Public Safety and the Judiciary (Nov. 18, 2010).

## STATUTES AND REGULATIONS

All applicable statutes and regulations are contained in the Brief for *Amicus Curiae* the District of Columbia.

## IDENTITY AND INTEREST OF AMICI

Media Amici are 31 leading news organizations and trade organizations. They or their members gather and disseminate news and information across the country, including in Washington, D.C.[2] *Amici* or their members are frequent defendants in SLAPP lawsuits in federal court, and several *amici* – including Hearst, NBC, the Washington City Paper, and Fox – have invoked the protections of the D.C. Anti-SLAPP law when sued over a publication on a matter of public concern. *Amici* believe they can offer the Court unique guidance on the issues presented by this appeal, in which they – and their readers and viewers, the public – have a significant interest.[3]

For the reasons explained below, Media Amici urge this Court to affirm the district court's decision.[4]

---

[2] The addendum to this brief contains a complete description of each *amicus*.

[3] *Amici* have concurrently moved for leave to file this *amici curiae* brief, pursuant to Fed. R. App. P. 29(a).

[4] Pursuant to Fed. R. App. P. 29(c)(5), undersigned counsel for the Media Amici hereby certifies that no party's counsel authored this brief in whole or part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person, other than *amici*

1

## ARGUMENT

The District of Columbia's Anti-SLAPP Act was enacted to encourage the swift and efficient dismissal of "Strategic Lawsuits Against Public Participation" ("SLAPPs") – actions filed "not to win the lawsuit but punish the opponent and intimidate them into silence."[5]  It requires plaintiffs to show, at the very outset in cases involving speech on matters of public interest, a likelihood of success on the merits before subjecting defendants to burdensome litigation.

This action – in which a prominent businessman and son of a foreign leader has sued over an opinion piece in a venerable foreign-policy publication raising questions about the relationship between his business interests and political connections – arises from precisely the category of speech protected by the Act.  It is also a typical example of the meritless suits that Media Amici regularly face, and which they regularly rely upon

_curiae_, their members, or their counsel, contributed money that was intended to fund preparing or submitting the brief.

[5] Council of the D.C. Committee on Public Safety and the Judiciary, Report on Bill 18-893, "Anti-SLAPP Act of 2010" (Nov. 18, 2010) ("Committee Report") at 4.

2

the substantive protections embodied in state anti-SLAPP statutes to combat.

Recognizing the Act's strong substantive protections for speech on matters of public concern, the district court correctly held that the Act applies to this case. The district court also correctly held that the plaintiff's defamation claims – which fail as a matter of law, since they challenge statements that are protected opinion and otherwise nonactionable – are subject to dismissal under the D.C. Act. Not only does the district court's decision appropriately resolve the case on the merits – in a manner fully consistent with the standards of the Federal Rules of Civil Procedure – but it also allows the defendants to seek to recover fees and costs for successfully defending against a particular breed of state-law claim that the District of Columbia has chosen to restrict through a statute that provides for qualified immunity and fee-shifting.

This case illustrates that the D.C. Act can comfortably exist "side by side" with the Federal Rules in a federal diversity action, "each controlling its own intended sphere of coverage without conflict." *Burke v. Air Serv Int'l*, 685 F.3d 1102, 1108 (D.C. Cir. 2012) (quoting *Walker v. Armco Steel Corp.*, 446 U.S. 740, 752 (1980)). The First, Second, Fifth, and Ninth Circuits,

3

and numerous district courts across the country – including nearly every federal district court to consider a motion under the D.C. Act[6] – have come to the same conclusion, agreeing that state anti-SLAPP laws apply in federal diversity actions because they supplement, rather than supplant, the Federal Rules.

Media Amici, 31 leading news organizations and related professional associations, gather and disseminate news in the District, and have headquarters, bureaus, or broadcast stations here. They often defend claims in diversity and, thus, would be substantially affected by any decision regarding whether the Act applies. Several Media Amici have cases pending in D.C. that could be directly affected by the outcome, and

---

[6] In arguing that the Act does not apply, the plaintiff relies almost exclusively on *3M Co. v. Boulter*, 842 F. Supp. 2d 85 (D.D.C. 2012), the one D.C. district court decision holding that the Act does not apply in federal court. Since *3M* was decided, every D.C. district court to address the issue – including the district court in this case – has rejected *3M*'s reasoning and applied the Act to state-law claims brought in federal court. *See Boley v. Atlantic Monthly Grp.*, 950 F. Supp. 2d 249, 254 (D.D.C. 2013) (rejecting *3M* and applying the D.C. Act in federal court); *Farah v. Esquire Magazine*, 863 F. Supp. 2d 29, 36 n.10 (D.D.C. 2012) (same), *aff'd on other grounds*, 736 F.3d 528 (D.C. Cir. 2013); *Sherrod v. Breitbart*, 843 F. Supp. 2d 83, 85 (D.D.C. 2012) (recognizing that the D.C. Act, like other state anti-SLAPP statutes, is "substantive – or at the very least, has substantive consequences" that would make it applicable in federal court under *Erie*), *aff'd*, 720 F.3d 932 (D.C. Cir. 2013).

others have successfully invoked the Act and analogous anti-SLAPP laws.[7] Media Amici do not address the full merits of the district court's decision, which they believe was correctly decided. Instead, based on their experience, Media Amici explain how – as in this case – the remedies provided under anti-SLAPP laws comfortably exist "side by side" with Rules 12 and 56, providing critical protection to the media disseminating news and information on issues of public concern. For the reasons set forth below, Media Amici urge this Court to affirm the district court's decision and hold that the D.C. Act applies in federal court.

### A.    D.C.'s Anti-SLAPP Act Broadly Applies to Claims Against the Media That Target the Exercise of Free Speech on Issues of Public Interest

Anti-SLAPP statutes are rooted in the central wisdom of *New York Times v. Sullivan*: burdensome civil litigation has as much or more of a chilling effect on public debate as criminal prosecution. 376 U.S. 254, 277 (1964) ("The fear of damage awards . . . may be markedly more inhibiting

---

[7] Underscoring the critical importance of this issue to members of the media, many of the Media Amici have also joined previous *amici* efforts urging this Court to find that the Act applies in federal court. In those prior cases, the Court declined to rule on the applicability of the D.C. Act, choosing to resolve the cases on alternative grounds.

than the fear of prosecution under a criminal statute."); *id.* at 279 ("[C]omparable 'self-censorship[]'" occurs when "would-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so.").

Accordingly, this Circuit has long prescribed that "[i]n the First Amendment area, summary procedures are even more essential." *Washington Post Co. v. Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966). In a libel case brought by a professor against syndicated columnists appearing in *The Washington Post*, this Court foresaw the "concern that a freshening stream of libel actions, which often seem as much designed to punish writers and publications as to recover damages for real injuries, may threaten the public and constitutional interest in free, and frequently rough, discussion." *Ollman v. Evans*, 750 F.2d 970, 994 (D.C. Cir. 1984) (en banc) (Bork, J., concurring). This concern remains today: "[I]f a suit entails long and expensive litigation, then the protective purpose of the First Amendment is thwarted even if the defendant ultimately prevails." *Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013) (internal quotations

6

omitted). *See also Coles v. Washington Free Weekly*, 881 F. Supp. 26, 30 (D.D.C. 1995) ("Given the threat to the first amendment posed by nonmeritorious defamation actions, it is particularly appropriate for courts to scrutinize such actions at an early stage of the proceedings to determine whether dismissal is warranted."), *aff'd*, 88 F.3d 1278 (D.C. Cir. 1996); *Myers v. Plan Takoma, Inc.*, 472 A.2d 44, 50 (D.C. 1983) ("In this area, perhaps more than any other, the early sifting of groundless allegations from meritorious claims made possible by a Rule 12(b)(6) motion is an altogether appropriate and necessary judicial function.").

The Act's protections are consistent with this mandate. In urging the adoption of the Act, based on similar statutes across the country, the Council recognized that SLAPP suits "have been increasingly utilized over the past two decades as a means to muzzle speech"; "[s]uch cases are often without merit, but achieve their filer's intention of punishing or preventing opposing points of view, resulting in a chilling effect . . . ." Committee Report at 1.

The Act's goal was to ensure that defendants, including the media, "are not intimidated or prevented, because of abusive lawsuits, from engaging in political or public policy debates" – debates that are the daily

7

conversation in the capital of the United States. *Id.* at 4. The Act provides media defendants facing a SLAPP "with substantive rights to expeditiously and economically dispense of litigation aimed to prevent their engaging in constitutionally protected actions on matters of public interest." *Id.*

The Act's central feature functions as a qualified immunity[8] requiring that "[i]f a party filing a special motion to dismiss . . . makes a prima facie showing that the claim . . . arises from an act in furtherance of the right of advocacy on issues of public interest," the court must grant the motion "unless the responding party demonstrates that the claim is likely to succeed on the merits . . . ." D.C. Code § 16-5502(b).

Unlike Rules 12 and 56, the Act does not apply to all claims, but rather *only* to claims based on statements made "[i]n connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law," and also to "[a]ny other expression or expressive conduct that involves petitioning the

---

[8] *See* Committee Report at 4 (Act follows "the lead of other jurisdictions, which have similarly extended absolute or qualified immunity to individuals engaging in protected actions").

8

government or communicating views to members of the public in connection with an issue of public interest." *Id.* § 16-5501(3).

The Act provides for a stay of discovery absent a showing that targeted discovery will defeat the motion and not be unduly burdensome. *Id.* § 16-5502(c). It also provides for expedited hearing on the special motion to dismiss, the issuance of a ruling as soon as practicable after the hearing, and if the motion to dismiss is granted, that the complaint be dismissed with prejudice. *Id.* § 16-5502(d). Successful defendants may be entitled to costs and attorney's fees. *Id.* § 16-5504(a).

In just the brief life of the D.C. law, at least eight anti-SLAPP cases in the District have already involved claims against the media, including Media Amici Hearst, NBC, the Washington City Paper, and Fox. Like the action here, these cases involved paradigmatic examples of the type of suit that anti-SLAPP laws are designed to discourage: where legal process is wielded as a weapon to punish political debate and criticism over matters of significant public moment, be it climate change, presidential legitimacy, or war crimes.[9] *See Boley*, 950 F. Supp. 2d 249 (granting anti-SLAPP motion

---

[9] In the introduction to his brief, Plaintiff insinuates that this case does not fit within the original intent of the D.C. Act, which he describes as

9

to dismiss defamation claims by former Liberian public official – who had been deported from the United States for alleged war crimes – against *The Atlantic* over two articles calling him a "warlord"); *Farah*, 863 F. Supp. 2d 29 (dismissing, under both the D.C. Act and Rule 12(b)(6), claims over satirical blog post by Esquire Magazine – published by Media Amicus Hearst –

---

protecting "normal, middle-class and blue-collar Americans" engaging in "grassroots activism." Brief of Plaintiff-Appellant ("Pl. Br.") at 2. This description comes not from the D.C. Council itself, but from a 1989 law review article that first introduced the term "SLAPP," quoted in a section of the Committee Report describing the history of SLAPPs. Committee Report at 2 (quoting from George W. Pring, *SLAPPs: Strategic Lawsuits against Public Participation*, 7 Pace Envtl. L. Rev. 3, 3 (1989). But while early anti-SLAPP cases evoked the specter of such "David vs. Goliath" scenarios, state anti-SLAPP laws have been applied across a far broader spectrum of cases. These statutes can be – and have been – used by defendants who are large or small, rich or poor, established news organizations (like defendant Foreign Policy) or freelance writers (like defendant Schanzer), and they apply without an analysis of the plaintiff's intent in bringing the claim. California courts – which D.C. courts look to for guidance in interpreting the similar D.C. Act, *see Boley*, 950 F. Supp. 2d at 255 – have developed a robust body of case law making clear that anti-SLAPP laws must be construed broadly, and that their protections extend far beyond the original fact pattern to cover a wide range of claims. *See, e.g., Lafayette Morehouse, Inc. v. Chronicle Publ'g Co.*, 37 Cal. App. 4th 855, 862 (1995) (rejecting assertion that statute was "adopted to deal only with the problems presented by archetypal SLAPP suits" and therefore "should not be interpreted to apply to a libel suit brought against media defendants based on their news reporting activities"). *See also generally* Thomas R. Burke, Anti-SLAPP Litigation §§ 2:5-2:7; 2:31, 3:147-3:150 (The Rutter Group 2013).

10

lampooning plaintiffs' book trumpeting "birther" claims shortly after President Obama released his long-form birth certificate), *aff'd*, 736 F.3d 528 (D.C. Cir. 2013); *Dean v. NBCUniversal*, No. 2011-CA-006055-B (D.C. Super. Ct. Nov. 14, 2012), *appeal pending*, No. 12 Civ. 1177 (D.C. Ct. App.) (argued Jan. 7, 2014) & *Dean v. NBCUniversal*, No. 12 Civ. 00283 (D.D.C. filed Feb. 21, 2012) (anti-SLAPP motions filed against claims by syndicated radio show host against Media Amicus NBC and MSNBC television host for broadcasts discussing political candidates, their views on homosexuality, and their controversial and highly-publicized associations with certain individuals, including plaintiffs); *Snyder v. Creative Loafing, Inc.*, No. 2011-CA-003168-B (D.C. Super. Ct. filed Apr. 26, 2011) (voluntary dismissal of Redskins owner Dan Snyder's libel suit against Media Amicus Washington City Paper over column criticizing Snyder's management of the Redskins, before anti-SLAPP motion could be fully briefed and decided); *Lehan v. Fox Television Stations, Inc.*, 2011 D.C. Super. LEXIS 14, at *3-4 (D.C. Super. Ct. Nov. 30, 2011) (granting SLAPP motion by Media Amicus Fox dismissing libel claims over news report that plaintiff, a public employee, earned excessive overtime, finding he failed to show "likelihood of success" of proving falsity or fault); *Sherrod*, 843 F. Supp. 2d 83 (finding defendant's

11

anti-SLAPP motion untimely in action against bloggers commenting on allegations of racism by public official); *Mann v. Nat'l Review, Inc.*, No. 2012-CA-008263-B, 2013 D.C. Super. LEXIS 8 (D.C. Super. Ct. July 19, 2013) (holding that D.C. Act applies to claims arising out of articles and blog post criticizing climate scientist's research, but denying motion on merits); *Doe v. Burke*, No. 2012-CA-7525-B (D.C. Super. Ct. Jan. 30, 2013) (motion under D.C. Act to quash subpoena seeking identity of anonymous Wikipedia editors who edited entry regarding plaintiff attorney's suits against U.S. military and federal contractors), *appeal pending*, No. 13 Civ. 83 (D.C. Ct. App.) (argued Jan. 29, 2014).

### B.    The D.C. Act, Like Other Anti-SLAPP Laws, Provides Substantive Protections That Protect the Media's Publication of News on Matters of Public Concern

Twenty-eight states and Guam have joined the District of Columbia in enacting anti-SLAPP laws to mitigate the chilling effect of meritless lawsuits brought not with the expectation of winning, but of harassing and silencing those who speak and publish on matters of public interest.[10] Federal courts – including every circuit court to consider the issue – have

---

[10] *See* Burke, Anti-SLAPP Litigation, Appendix B (compiling state anti-SLAPP laws).

acknowledged the laws' substantive, speech-protective nature by applying them in diversity actions, where they supplement, rather than supplant, Rules 12 and 56.

Supreme Court precedent instructs that, before moving to an *Erie* analysis, courts must first determine whether there is a true conflict between a state law and federal rule, asking whether there is a "direct collision" between the state law and federal rule that "leave[s] no room for the operation of [the state] law." *Walker*, 446 U.S. at 749-50; *Burlington Northern R.R. Co. v. Woods*, 480 U.S. 1, 4-5 (1987). *See also Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010) (courts must first decide whether federal rule is inapplicable or invalid before moving to *Erie* analysis). Engaging in thorough analyses of *Shady Grove* and its predecessors, the Ninth and First Circuits have explained why state anti-SLAPP laws do not "directly collide" with Rules 12 and 56. *See Godin v. Schencks*, 629 F.3d 79, 86-91 (1st Cir. 2010); *Makaeff v. Trump Univ., LLC*, 736 F.3d 1180, 1181-84 (9th Cir. 2013).[11]

---

[11] Defendants-Appellees address this issue in their brief, *see* Brief of Defendants-Appellees ("Def. Br.") at 46-58, and *amici* do not repeat their arguments here. As explained below, *amici*'s practical experience litigating SLAPP motions confirms that remedies provided under anti-SLAPP laws

Nearly fifteen years ago, the Ninth Circuit held that California's anti-SLAPP statute – on which the D.C. Act is modeled[12] – applied in federal court, finding that the statute "can exist side by side" with the Federal Rules, "each controlling its own intended sphere of coverage without conflict." *U.S. ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 972 (9th Cir. 1999) (quoting *Walker*, 446 U.S. at 752); *cf. Burke*, 685 F.3d at 1108 (quoting *Walker*, 446 U.S. at 752) (D.C.'s expert rule can be applied "simultaneously" with the Federal Rule, and thus "can exist side by side"). Since that time, the Ninth Circuit has routinely resolved anti-SLAPP appeals. *See, e.g., DC Comics v. Pac. Pictures Corp.*, 706 F.3d 1009 (9th Cir. 2013); *Northon v. Rule*, 637 F.3d 937 (9th Cir. 2011); *Hilton v. Hallmark Cards*, 599 F.3d 894 (9th Cir. 2010); *Gardner v. Martino*, 563 F.3d 981 (9th Cir. 2009); *Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003). The First, Second and Fifth Circuits have followed suit, finding that state anti-SLAPP laws provide

---

comfortably exist "side by side" with Rules 12 and 56. *See Walker*, 446 U.S. at 752. *See also* Colin Quinlan, *Erie and the First Amendment: State Anti-SLAPP Laws in Federal Court After Shady Grove*, 114 Colum. L. Rev. 367, 400-03 (2014) (explaining how state anti-SLAPP laws "complement[] -- rather than conflict[] with" the Federal Rules).

[12] *See* Committee Report at 1 (the Act "follows the model set forth in a number of other jurisdictions").

14

substantive protections that apply to state claims in federal court. *See Godin*, 629 F.3d at 91 (1st Cir. 2010); *Henry v. Lake Charles Am. Press, LLC*, 566 F.3d 164, 168-70 (5th Cir. 2009); *Liberty Synergistics Inc. v. Microflo Ltd.*, 718 F.3d 138, 143-44 (2d Cir. 2013).[13]

The Ninth Circuit recently reaffirmed *Newsham*, declining a request by Chief Judge Kozinski that the en banc court reconsider (and reverse) its earlier ruling. In April 2013, a three-judge panel in *Makaeff v. Trump University, LLC* affirmed the district court's application of the law to a defamation counterclaim. 715 F.3d 254 (9th Cir. 2013). In a strongly worded concurrence, Judge Kozinski urged the court to hear the case en banc and reverse its holding in *Newsham* on the ground that federal courts "have no business applying exotic state procedural rules which, of necessity, disrupt the comprehensive scheme embodied in the Federal Rules." *Id.* at 275. The full court refused to do so. *Makaeff v. Trump Univ., LLC*, 736 F.3d 1180 (9th Cir. 2013). In a concurrence, four judges opined

---

[13] The issue is also currently before the Seventh Circuit, in an appeal from a Northern District of Illinois case declining to apply Washington's anti-SLAPP law in federal court. *See Intercon Solutions, Inc. v. Basel Action Network*, --- F. Supp. 2d ---, 2013 WL 4552782 (N.D. Ill. Aug. 28, 2013), *appeal docketed*, No. 13-3148 (7th Cir. Sept. 30, 2013).

15

that refusing to recognize the limitations placed on SLAPPs by seven state legislatures in the Ninth Circuit is not only at odds with *Erie* but is "bad policy," noting that citizens of those states "should not be stripped of their state's free speech protections whenever they step inside a federal court." *Id.* at 1187.

Like every other appellate federal court to consider the issue, the *Makaeff* court recognized that in limiting certain categories of frivolous state-law claims, anti-SLAPP laws act alongside – not in conflict with – the Federal Rules.   *Id.* at 1183. [14]   In fact, these are precisely the type of substantive state laws that are given effect under *Erie.   See Milam v. State Farm Mut. Auto Ins. Co.*, 972 F.2d 166, 170 (7th Cir. 1992) ("[W]here a state in furtherance of its substantive policy makes it more difficult to prove a particular type of [] claim," this rule "will be given effect in a diversity suit

_____

[14] *See also Liberty Synergistics*, 718 F.3d at 148 (California's anti-SLAPP law "reflects a substantive policy favoring the special protection of certain defendants from the burdens of litigation because they engaged in constitutionally protected activity"); *Godin*, 629 F.3d at 87-88 (Maine's anti-SLAPP law is "not [] a substitute to the Federal Rules," but a "supplemental and substantive rule to provide added protections, beyond those in Rules 12 and 56, to defendants who are named as parties because of constitutional petitioning activities"); *Henry*, 566 F.3d at 168-69 (Louisiana anti-SLAPP law, even though "nominally procedural," applies in diversity case).

as an expression of state substantive policy.").[15]    The tools of an anti-SLAPP law – fee-shifting, expedited consideration, a required prima facie showing of support for the claim (with discovery permitted only as necessary for that showing), and an immediate right of appeal – add "additional, unique weapon[s] to the pretrial arsenal" that supplement the gatekeeping protections of Rules 12 and 56, helping to protect speech on matters of public concern from costly litigation by quickly weeding out claims that have no hope of succeeding on the merits.  *Newsham*, 190 F.3d at 973.

Media Amici have found through experience that anti-SLAPP statutes work in concert with, rather than contravene, Rules 12 and 56. "Some [SLAPP] motions, like Rule 12(b)(6) motions, will be resolved on the pleadings," while others "will permit courts to look beyond the pleadings to affidavits and materials of record, as Rule 56 does." *Godin*, 629 F.3d at 90 & n.17.  In particular, the fee-shifting provision of an anti-SLAPP statute – a well-established expression of substantive state law routinely given effect

---

[15] For example, this Court has applied D.C. law requiring plaintiffs to offer expert testimony to prove certain types of negligence claims, even though no such requirement is found in the Federal Rules of Evidence. *Burke*, 685 F.3d at 1108. *See also* Def. Br. at 51-54 (providing additional examples).

17

in diversity cases[16] – is a significant deterrent to would-be plaintiffs without a meritorious claim and reduces the incidence of appeals, which are often dropped in exchange for a waiver of attorney fees. *See* Robert D. Richards, *A SLAPP in the Facebook: Assessing the Impact of Strategic Lawsuits Against Public Participation on Social Networks, Blogs & Consumer Gripe Sites*, 21 DePaul J. Art Tech. & Intell. Prop. L. 221, 245 (Spring 2011) (explaining that after plaintiffs review the anti-SLAPP statute, "[i]n most cases now you can just persuade them not to file the action at all"). If federal courts did not apply state anti-SLAPP laws, this preemptive effect would dissipate as plaintiffs simply shifted to federal court.[17]

---

[16] *See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 259 n.31 (1975) ("[I]n an ordinary diversity case where the state law does not run counter to a valid federal statute or rule of court, and usually it will not, state law denying the right to attorney's fees or giving a right thereto, which reflects a substantial policy of the state, should be followed."); *United States v. One Parcel of Property Located at 414 Kings Highway*, 1999 WL 301704, at *4 (D.D.C. May 11, 1999) (citing *Alyeska* and noting that, "[i]n diversity cases, attorney's fees are considered substantive and are controlled by state law"); *Godin*, 629 F.3d at 86 n.10 & 90 n.15 (noting that the fee-shifting provision for a successful anti-SLAPP motion, like other "nominally procedural state rule[s] authorizing an award of attorney's fees as a sanction for obstinate litigation," is "substantive for purposes of *Erie* analysis").

[17] *Makaeff*, 736 F.3d at 1187 (warning that "[w]ithout anti-SLAPP protections in federal courts, SLAPP plaintiffs would have an incentive to

18

Even if a plaintiff does file suit, an anti-SLAPP motion can mitigate the chilling effect on media defendants by forcing a plaintiff to take an honest look at the merits early on -- before litigation costs mount. *See, e.g.,* Bruce E.H. Johnson & Sarah K. Duran, *A View from the First Amendment Trenches: Washington State's New Protections for Public Discourse & Democracy*, 87 Wash. L. Rev. 495, 503 (June 2012) (noting that this "particularly important" mechanism "requires the plaintiff to come forward early in the case to demonstrate that the claims are viable, and if they are not viable, the court must dismiss the claims before the defendant is bogged down in expensive litigation"); Josh Gerstein, *Charity Drops Suit against Terrorism Analyst*, New York Sun (Aug. 16, 2007), *available at* http://www.nysun.com/national/charity-drops-suit-against-terrorism-analyst/60635/ (after defendants filed California anti-SLAPP motion, Islamic charity dropped libel suit against author and publisher over book suggesting charity was funding Hamas).

Where the parties attach material outside the pleadings, the Act – like the California law on which it was modeled – establishes a "summary-

---

file or remove [such lawsuits] to federal courts").

19

judgment-like procedure available at an early stage of litigation that poses a potential chilling effect on speech-related activities." *Makaeff*, 736 F.3d at 1183 (internal quotation marks and citation omitted). The plaintiff

> must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited. Though the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim.

*Hilton*, 599 F.3d at 903 (internal quotation marks and citation omitted). As the district court noted – consistent with courts construing similar provisions in state anti-SLAPP statutes – this standard is "comparable to that used on a motion for judgment as a matter of law." *Abbas v. Foreign Policy Grp., LLC*, --- F. Supp. 2d ---, 2013 WL 5410410, at *7 (D.D.C. Sept. 27, 2013) (quoting *Price v. Stossel*, 620 F.3d 992, 1000 (9th Cir. 2010)). As a result, the anti-SLAPP law functions, "at worst," "merely as a mechanism for considering summary judgment at the pleading stage as is permitted under Rule 12(d)." *Makaeff*, 736 F.3d at 1183.[18]

---

[18] This commonly-accepted construction of the standard for granting an anti-SLAPP motion also demonstrates why Plaintiff's objection to the D.C.

20

A robust anti-SLAPP statute allows the media to do its job of informing the public without being subject to the expense, harassment, and disruption caused by groundless reprisal lawsuits. Given strong First Amendment protections for speech regarding public figures and matters of public concern, many suits brought against the media are susceptible to dismissal on purely legal grounds, such as lack of defamatory meaning, opinion, substantial truth, application of the fair report privilege, and the absence of actual malice. These suits can be exposed as meritless with little or no discovery where it is clear from the publication itself, pleadings and supporting affidavits that the plaintiff cannot possibly meet the burdens of proving fault and falsity as required by the First Amendment.[19]

---

Act on Seventh Amendment grounds is entirely misplaced – to the extent it is even properly before this Court, *see* Def. Br. at 50-51. Just as granting a motion for summary judgment or a motion to dismiss does not deny the plaintiff his Seventh Amendment right to a jury trial, there is no Seventh Amendment violation in granting an anti-SLAPP motion to dispose of a plaintiff's claim where, as here, it fails as a matter of law. *See, e.g.*, *Lafayette Morehouse*, 37 Cal. App. 4th at 866-67 (anti-SLAPP statute does not violate right to trial by jury); *Dixon v. Superior Court*, 30 Cal. App. 4th 733, 746 (1994) (same); *see also* Def. Br. at 50-52 (explaining why no Seventh Amendment issue is presented in this case).

[19] For example, in this case, defendants included publicly available news articles demonstrating that the claims arise from a matter of public interest and the plaintiff is a public figure for purposes of First Amendment

21

Media defendants regularly rely on these tools to combat abusive suits and avoid drawn-out litigation over reporting stories on matters of public concern. For example:

- A D.C. federal district court granted an anti-SLAPP motion and Rule 12(b)(6) motion to dismiss claims brought by "birther" activists (i.e., those who question President Obama's U.S. citizenship) over a satirical blog post by Esquire Magazine (published by Media Amicus Hearst) that lampooned plaintiffs' book, titled "Where's the Birth Certificate?", that was published shortly after President Obama released his long-form birth certificate. The court found that because the blog post was First Amendment-protected satire on a topic of public interest, the D.C. Act applied and the plaintiff could not succeed on his claims. *Farah*, 863 F. Supp. 2d 29, *aff'd on other grounds*, 736 F.3d 528 (D.C . Cir. 2013).

- A D.C. federal district court granted an anti-SLAPP motion to dismiss defamation claims brought by George Boley, a former Liberian public official ultimately deported from the United States for alleged war crimes, against *The Atlantic* over two articles that called Boley a "warlord." Whereas the defendants submitted public documents that showed both a lack of falsity and a lack of actual malice, Boley "adduced no *facts* indicating that the 'warlord' statements were false

---

considerations. Such references are subject to judicial notice, do not require discovery, and do not even convert a motion under Rule 12 to one for summary judgment under Rule 12(d). *See Farah*, 736 F.3d at 534 (taking judicial notice of "publicly available historical articles" attached to publisher's motion to dismiss libel claim). In rare instances, however, discovery can be permitted by a court. To the extent a plaintiff seeks discovery to respond to an anti-SLAPP motion, a plaintiff may do so upon a showing that it "appears likely" that such discovery "will enable the plaintiff to defeat the motion" and that the discovery will not be "unduly burdensome" -- a standard consistent with Fed. R. Civ. P. 56(d).

22

or made with actual malice, offering only broad and conclusory denials of Goldberg's comments." *Boley*, 950 F. Supp. 2d at 250. Because Boley failed to present any evidence of falsity and actual malice, the court granted the anti-SLAPP motion and dismissed his claims. *See id.* at 262-63.

- The Ninth Circuit affirmed an Oregon district court's grant of an anti-SLAPP motion, dismissing false light and defamation claims over a true-crime book describing the details of the plaintiff's killing of her husband – a crime to which the plaintiff had pleaded guilty. The court found that the plaintiff failed to show that any statements in the book were false or defamatory, justifying the application of the anti-SLAPP law. *Northon v. Rule*, 409 F. App'x 146 (9th Cir. 2011) (affirming grant of anti-SLAPP motion); *Northon v. Rule*, 637 F.3d 937 (9th Cir. 2011) (affirming grant of attorneys' fees).

- A Louisiana federal district court dismissed a doctor's libel and false light suit against Media Amici ProPublica and The New York Times over a Pulitzer Prize-winning article about alleged euthanasia of patients by hospital staff during Hurricane Katrina. The court held that the anti-SLAPP statute did not conflict with Rule 56, the article involved a matter of public interest, and even limited discovery could not rebut the media defendants' showing there was no negligence or substantial falsity in publishing the reports. *Armington v. Fink*, 2010 WL 743524, at *1, *5 (E.D. La. Feb. 24, 2010).

- A California federal district court granted an anti-SLAPP motion arising out of a *Los Angeles Times* article (published by Media Amicus Tribune Company) that questioned the plaintiff's claims in a published biography that he was a war hero, holding that no reasonable juror could find that the defendants intended to convey the impression that the plaintiff lied about his past. *Thomas v. L.A. Times Commc'ns LLC*, 189 F. Supp. 2d 1005, 1009-10 (C.D. Cal. 2002), *aff'd*, 45 F. App'x 801 (9th Cir. 2002).

- A California federal district court granted an anti-SLAPP motion to dismiss invasion of privacy claims based on Media Amicus The

23

Associated Press's publication of unaltered photographs of Navy SEALs allegedly mistreating Iraqi prisoners on the ground that the complaint failed to allege offensiveness or a reasonable expectation of privacy. *Four Navy Seals v. Associated Press*, 413 F. Supp. 2d 1136, 1140, 1149-50 (S.D. Cal. 2005).

- A New York federal court dismissed libel claims brought by Sheldon Adelson, a casino magnate and well-known funder of "Super PACs" supporting Republican candidates in the 2012 election (and a serial libel plaintiff), against the National Jewish Democratic Council and two of its leaders over a petition urging Republican candidates not to accept Adelson's money because it was "dirty" or "tainted." The court dismissed Adelson's claims under Rule 12(b)(6) and the Nevada anti-SLAPP statute, finding that the statements at issue were non-actionable opinion, the petition qualified for the anti-SLAPP statute's protection, and the plaintiff failed to allege even knowledge of falsity – much less facts to support such a conclusion – as the Nevada statute required. *Adelson v. Harris*, --- F. Supp. 2d ---, 2013 WL 5420973, at *15-16, *26-28 (S.D.N.Y. Sept. 20, 2013), *appeal docketed*, No. 13-4173 (2d Cir. Oct. 31, 2013).

- A California federal district court granted a scientific journal's anti-SLAPP motion to dismiss libel and unfair competition claims arising out of a peer-reviewed scientific research article about heart disease. The court found that the statements concerned a matter of public interest and, since the statements were protected by California's common interest privilege, the plaintiff had no reasonable likelihood of succeeding on his claim. *Critical Care Diagnostics, Inc. v. American Ass'n for Clinical Chemistry, Inc.*, 2014 WL 842951 (S.D. Cal. Mar. 4, 2014).

- An Indiana district court granted an anti-SLAPP motion to dismiss claims brought against a local broadcaster by a Canadian prescription drug distributor on the grounds that defendant's news report on the safety and legality of pharmaceuticals involved a matter of public interest, was broadcast without serious doubts as to the truth, and

24

was substantially true or not defamatory. *CanaRx Servs. v. LIN Television Corp.*, 2008 WL 2266348 (S.D. Ind. May 29, 2008).

- A Washington federal district court granted an anti-SLAPP motion dismissing right of publicity claims against the producers of *Sicko*, an Academy Award-nominated documentary film about the U.S. healthcare system. The court held that the plaintiff failed to show a likelihood of prevailing because the documentary was an expressive work, and the plaintiff's likeness was published in connection with a matter of public interest, and therefore immune from liability under both state law and the First Amendment. *Aronson v. Dog Eat Dog Films, Inc.*, 738 F. Supp. 2d 1104, 1112-13 (W.D. Wash. 2010).

By applying state anti-SLAPP laws, the court in each of these cases was able to efficiently dispose of meritless claims brought to retaliate against speech on matters of public concern, significantly limiting the cost and burden of these abusive suits. If the application of state anti-SLAPP laws were limited to state courts, SLAPP plaintiffs would simply evade them by filing in or removing to federal court, thus effectively commandeering the federal courts to help chill reporting on matters of public concern. *See Newsham*, 190 F.3d at 973 ("Plainly, if the anti-SLAPP provisions are held not to apply in federal court, a litigant interested in bringing meritless SLAPP claims would have a significant incentive to shop for a federal forum."). As the Ninth Circuit recently warned:

> Without anti-SLAPP protections in federal courts, SLAPP plaintiffs would have an incentive to file or remove to federal

courts strategic, retaliatory lawsuits that are more likely to have the desired effect of suppressing a SLAPP defendant's speech-related activities. Encouraging such forum-shopping chips at away at "one of the modern cornerstones of our federalism."

*Makaeff*, 736 F.3d at 1187 (quoting *Hanna v. Plumer*, 380 U.S. 460, 474 (1965) (Harlan, J., concurring)).

These are not academic concerns. Following the *3M v. Boulter* decision, a defamation plaintiff attempted to abandon his action in D.C. Superior Court – after extensive briefing and on the eve of oral arguments on dispositive motions – for the admitted purpose of pursuing his claims in federal court because he assumed the D.C. Anti-SLAPP Act would not be applied there. *See Dean v. NBCUniversal*, No. 12 Civ. 00283, ECF No. 5-1 (D.D.C. filed Feb. 21, 2012) (plaintiffs' notice of voluntary dismissal in D.C. Superior Court of claims against Media Amicus NBC, stating that "[t]he Complaint has been refiled in the U.S. District Court for the District of Columbia due to the Court's recent decision in *3M v. Boulter*"). *See also Forras v. Rauf*, No. 12 Civ. 282, ECF No. 2-3 (D.D.C. filed Mar. 22, 2012) (same); Eliza Krigman, *Yelp Pushes for Federal Anti-SLAPP Laws*, Politico (Jan. 4. 2013), http://www.politico.com/story/2013/01/yelp-pushes-for-federal-anti-slapp-laws-85737.html (positing that lawsuit was filed in

26

Virginia, rather than plaintiff's home state of the District of Columbia, because Virginia has no anti-SLAPP law).

Such forum-shopping thwarts the purpose of anti-SLAPP statutes and undermines the interest of the state – in this case, the District of Columbia – in protecting its citizens from abusive lawsuits. This concern is particularly salient in the District, where local media outlets regularly report on matters of national and international concern – and where, as a result, the potential plaintiff is almost invariably a citizen of another U.S. state or (as here) a foreign citizen, with the ability to invoke the federal court's diversity jurisdiction.

### C. This Case Bears Out Media Amici's Experience that Anti-SLAPP Laws Supplement, Rather than Supplant, the Procedures Under the Federal Rules for Disposing of Meritless Libel Claims

Consistent with Media Amici's experience, the instant suit provides yet another illustration that a dismissal pursuant to a state anti-SLAPP law can exist comfortably "side by side" with the Federal Rules. After finding that the article concerned an "issue of public interest" subject to the D.C. Act, the district court held that the plaintiff failed to meet the second prong of the law – demonstrating a "probability of prevailing" on his claim –

because the statements at issue are not actionable *as a matter of law*. The district court found that the allegedly "libelous questions" in the article were not defamatory because they were rhetorical devices capable only of implying the author's First Amendment-protected opinion, not assertions of fact, and that the remaining statements at issue were not "of and concerning" the plaintiff.[20]

The grounds on which the district court granted defendant's special motion to dismiss are quintessential matters of law that do not require the court to weigh competing facts or determine the credibility of evidence. In fact, the First Amendment requires courts to resolve these "threshold" questions of law – including whether a statement is "of and concerning" the plaintiff, whether it states facts capable of being proven true or false, and whether it is capable of a defamatory meaning – before considering whether a defendant can be liable for defamation at all. *Farah*, 736 F.3d at 534-35 (affirming Rule 12(b)(6) dismissal where satirical article made no actionable statements of fact). As a result, courts regularly dismiss libel

---

[20] On appeal, the plaintiff appears to be challenging only the district court's holding that the allegedly "libelous questions" were not defamatory, and not its holding that the remaining statements at issue were not "of and concerning" the plaintiff. Pl. Br. at 41-52.

28

suits against media defendants as a matter of law where, as here, the

publication at issue simply raises questions or offers opinions, but does not

assert any actionable *facts*.[21]

By applying the D.C. Act to dismiss the plaintiff's claim, the district

court not only disposes of a meritless claim on a matter of public interest in

a timely manner – fulfilling this court's mandate to resolve such cases early

– but allows the defendants to recover the costs incurred to defend

---

[21] *See, e.g., Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1094 (4th Cir. 1993) (dismissing defamation claim over article that raised questions about charity's program to send gift packages to soldiers overseas, finding that "provok[ing] public scrutiny of the plaintiffs' activities" is not an assertion of false and defamatory fact); *Levin v. McPhee*, 119 F.3d 189, 196-97 (2d Cir. 1997) (dismissing libel claim against over book passage positing various possible versions of events surrounding a mysterious fire, holding that statements were protected opinion, not defamatory fact); *Partington v. Bugliosi*, 56 F.3d 1147, 1156-57 (9th Cir. 1995) (dismissing defamation claims arising out of book and documentary about murder trial, holding that question as to whether plaintiff was properly prepared for trial was not capable of defamatory meaning); *Phantom Touring, Inc. v. Affiliated Publ'ns*, 953 F.2d 724, 730 (1st Cir. 1992) (dismissing defamation claim over theater column that asked whether the plaintiff was "trying to score off" the success of a well-known Broadway play in promoting his similarly-named musical comedy); *Cibenko v. Worth Publishers, Inc.*, 510 F. Supp. 761, 764-65 (D.N.J. 1981) (rhetorical question posed in textbook photograph caption, asking whether police officer in the photo would be likely to treat the offender depicted differently if he were white instead of black, was not capable of defamatory meaning). *See also* Def. Br. at 17-20 (collecting and discussing cases).

29

themselves against a SLAPP suit, providing crucial protections to media defendants who regularly face such suits in retaliation for publishing stories about matters of public concern.

## CONCLUSION

For these reasons, Media Amici respectfully ask this Court to affirm the district court's decision and to hold that the D.C. Anti-SLAPP Act applies in federal actions.

Respectfully submitted,

/s/ Laura R. Handman

Laura R. Handman
Alison Schary
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue, NW
Suite 800
Washington, DC 20006
Tel: (202) 973-4200
Fax: (202) 973-4499

Thomas R. Burke
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street
Suite 800
San Francisco, CA 94111
Tel.: (415) 276-6500
Fax: (415) 276-6599

*Counsel for Media Amici*

Dated: April 2, 2014

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE 32(A)(5)-(7)

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32(a)(1) because it contains 6,984 words, excluding exempted parts, as determined by the word-counting feature of Microsoft Word.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Book Antiqua font.

/s/ Laura R. Handman
Laura R. Handman

31

## ADDENDUM:

## DESCRIPTIONS OF *AMICI CURIAE*

**Advance Publications, Inc.**, directly and through its subsidiaries, publishes 18 magazines with nationwide circulation, newspapers in over 20 cities, and weekly business journals in over 40 cities throughout the United States. It also owns many internet sites and has interests in cable systems serving over 2.3 million subscribers.

With some 500 members, the **American Society of News Editors** ("ASNE") is an organization that includes directing editors of daily newspapers throughout the Americas. ASNE changed its name in April 2009 to American Society of News Editors and approved broadening its membership to editors of online news providers and academic leaders. Founded in 1922 as American Society of Newspaper Editors, ASNE is active in a number of areas of interest to top editors with priorities on improving freedom of information, diversity, readership and credibility of newspapers.

**The Associated Press** ("AP") is a news cooperative organized under the Not-for-Profit Corporation Law of New York, and owned by its 1,500 U.S. newspaper members. The AP's members and subscribers include the

32

nation's newspapers, magazines, broadcasters, cable news services and Internet content providers. The AP operates from 300 locations in more than 100 countries. On any given day, AP's content can reach more than half of the world's population.

The **Association of Alternative Newsmedia** ("AAN") was founded in 1978 and has grown to include 117 alternative news organizations covering every major metropolitan area and other less-populated regions of North America. AAN member publications reach more than 25 million active, educated and influential adults in print, on the web and on mobile devices. The association's members share a strong focus on local news, culture and the arts; an informal style; an emphasis on point-of-view reporting and narrative journalism; a tolerance for individual freedoms and social differences; and an eagerness to report on issues and communities that many mainstream media outlets ignore.

The **Association of American Publishers, Inc.** ("AAP") is the national trade association of the U.S. book publishing industry. AAP's members include most of the major commercial book publishers in the United States, as well as smaller and nonprofit publishers, university presses and scholarly societies. AAP members publish hardcover and

33

paperback books in every field, educational materials for the elementary, secondary, post-secondary and professional markets, scholarly journals, computer software and electronic products and services. The Association represents an industry whose very existence depends upon the free exercise of rights guaranteed by the First Amendment.

**Bloomberg L.P.** operates Bloomberg News, a 24-hour global news service based in New York with more than 2,400 journalists in more than 150 bureaus around the world. Bloomberg supplies real-time business, financial, and legal news to the more than 319,000 subscribers to the Bloomberg Professional service world-wide and is syndicated to more than 1000 media outlets across more than 60 countries. Bloomberg television is available in more than 340 million homes worldwide and Bloomberg radio is syndicated to 200 radio affiliates nationally. In addition, Bloomberg publishes Bloomberg Businessweek, Bloomberg Markets and Bloomberg Pursuits magazines with a combined circulation of 1.4 million readers and Bloomberg.com and Businessweek.com receive more than 24 million visitors each month. In total, Bloomberg distributes news, information, and commentary to millions of readers and listeners each day, and has published more than one hundred million stories.

34

The **Center for Public Integrity** is one of the nation's oldest and largest nonpartisan, nonprofit investigative news organizations. Its mission is to serve democracy by revealing abuses of power, corruption and betrayal of public trust by powerful public and private institutions, using the tools of investigative journalism. The Center's editorial staff consists of journalists, FOIA experts, copy editors, researchers, fact-checkers, and data experts who work on the Center's investigative projects and stories.

**Dow Jones & Company, Inc.**, a global provider of news and business information, is the publisher of The Wall Street Journal, Barron's, MarketWatch, Dow Jones Newswires, and other publications. Dow Jones maintains one of the world's largest newsgathering operations, with more than 1,800 journalists in more than fifty countries publishing news in several different languages. Dow Jones also provides information services, including Dow Jones Factiva, Dow Jones Risk & Compliance, and Dow Jones VentureSource. Dow Jones is a News Corporation company.

**The Economist Newspaper Limited** ("The Economist") is the parent of a multinational group of media companies headquartered in London. The Economist Group is built on high-quality, independent

analysis which runs through all of its businesses. It includes The Economist newspaper, the Economist Intelligence Unit and CQ Roll Call. From its beginnings in 1843, when The Economist newspaper was founded by a Scottish hat manufacturer to further the cause of free trade, The Economist Group has evolved into a global media company that develops intelligent brands for the intellectually curious.

**The E.W. Scripps Company** is a diverse, 131-year-old media enterprise with interests in television stations, newspapers, and local news and information web sites. The company's portfolio of locally focused media properties includes: 19 TV stations (10 ABC affiliates, three NBC affiliates, one independent and five Azteca Spanish language stations); daily and community newspapers in 13 markets; and the Washington, D.C.-based Scripps Media Center, home of the Scripps Howard News Service.

**Fox Entertainment Group, Inc.** ("Fox") is an integrated entertainment company with a global portfolio of cable and broadcasting networks and properties, including FOX, FX, FXX, FXM, FS1, Fox News Channel, Fox Business Network, Fox Sports, Fox Sports Network, National Geographic Channels, MundoFox, STAR, 28 local television stations in the

U.S. and more than 300 channels that comprise Fox International Channels; film studio Twentieth Century Fox Film; and television production studios Twentieth Century Fox Television and Shine Group.

**Gannett Co., Inc.** is an international news and information company that publishes more than 80 daily newspapers in the United States – including USA TODAY – which reach 11.6 million readers daily. The company's broadcasting portfolio includes more than 40 TV stations, reaching approximately one-third of all television households in America. Each of Gannett's daily newspapers and TV stations operates Internet sites offering news and advertising that is customized for the market served and integrated with its publishing or broadcasting operations.

**Hearst Corporation** is one of the nation's largest diversified media companies. Its major interests include the following: ownership of 15 daily and more than 30 weekly newspapers, including the Houston Chronicle, San Francisco Chronicle and Albany (N.Y.) Times Union; nearly 300 magazines around the world, including Good Housekeeping, Cosmopolitan and O, The Oprah Magazine; 29 television stations, which reach a combined 18% of U.S. viewers; ownership in leading cable networks, including Lifetime, A&E and ESPN; business publishing,

37

including a joint venture interest in Fitch Ratings; and Internet businesses, television production, newspaper features distribution and real estate.

**The McClatchy Company**, through its affiliates, publishes 30 daily newspapers and related websites as well as numerous community newspapers and niche publications across the United States.

The **Media Law Resource Center, Inc.** (MLRC) is a non-profit professional association for content providers in all media, and for their defense lawyers, providing a wide range of resources on media and content law, as well as policy issues. These include news and analysis of legal, legislative and regulatory developments; litigation resources and practice guides; and national and international media law conferences and meetings.

**The National Press Club** is a membership organization dedicated to promoting excellence in journalism and protecting the First Amendment guarantees of freedom of speech and of press. Founded in 1908, it is the nation's largest journalism association.

The **National Press Photographers Association** ("NPPA") is a 501(c)(6) nonprofit organization dedicated to the advancement of visual journalism in its creation, editing and distribution. NPPA's almost 7,000

members include television and still photographers, editors, students and representatives of businesses that serve the photojournalism industry. Since its founding in 1946, the NPPA has vigorously promoted the constitutional rights of journalists as well as freedom of the press in all its forms, especially as it relates to photojournalism.

**National Public Radio, Inc.** ("NPR") is a District of Columbia nonprofit membership corporation. It produces and distributes its radio programming through, and provides trade association services to, nearly 800 public radio member stations located throughout the United States and in many U.S. territories. NPR's award-winning programs include Morning Edition, and All Things Considered, and serve a growing broadcast audience of over 23 million Americans weekly. NPR also distributes its broadcast programming online, in foreign countries, through satellite, and to U.S. Military installations via the American Forces Radio and Television Service.

**NBCUniversal Media, LLC** ("NBC") is one of the world's leading media and entertainment companies in the development, production and marketing of news, entertainment and information to a global audience. Among other businesses, NBC owns and operates the NBC television

39

network, the Spanish-language television network Telemundo, NBC News, news and cable networks including MSNBC and CNBC, and owned-and-operated television stations that produce substantial amounts of local news, sports and public affairs programming. NBC owns and operates WRC-TV NBC4 in Washington, D.C. NBC produces the "Today" show, "NBC Nightly News with Brian Williams," "Dateline NBC" and "Meet the Press."

**News Corporation** is a global, diversified media and information services company focused on creating and distributing authoritative and engaging content to consumers throughout the world. The company comprises leading businesses across a range of media, including: news and information services, digital real estate services, book publishing, digital education, and sports programming and pay-TV distribution.

**The New York Times Company** is the publisher of The New York Times and the International New York Times and operates nytimes.com and related websites.

The **Newspaper Association of America** (NAA) is a nonprofit organization representing the interests of more than 2,000 newspapers in the United States and Canada. NAA members account for nearly 90% of

the daily newspaper circulation in the United States and a wide range of non-daily newspapers. The Association focuses on the major issues that affect today's newspaper industry, including protecting the ability of the media to provide the public with news and information on matters of public concern.

**The Online News Association** ("ONA") is the nation's premier organization of digital journalists. ONA's members include reporters, news writers, editors, producers, designers, photographers and others who produce news for distribution over the Internet and through other digital media, as well as academics and others interested in the development of online journalism. ONA is dedicated to advancing the interests of online journalists and the public, generally, by encouraging editorial integrity, editorial independence, journalistic excellence, freedom of expression, and freedom of access.

The **Online Publishers Association** ("OPA") is a not-for-profit trade organization dedicated to representing high-quality online content providers before the advertising community, the press, the government and the public. Its members include many of the most trusted and well-respected media brands. OPA seeks to establish and promote the Internet

41

as a sustainable media business for publishers, thereby ensuring the continued availability of quality content for consumers worldwide.

**Pro Publica, Inc.** ("ProPublica") is an independent, nonprofit newsroom that produces investigative journalism in the public interest. In 2010, it was the first online news organization to win a Pulitzer Prize. In 2011, ProPublica won the first Pulitzer awarded to a body of work that did not appear in print. ProPublica is supported primarily by philanthropy and provides the articles it produces free of charge, both through its own website and to leading news organizations selected with an eye toward maximizing the impact of each article.

The **Reporters Committee for Freedom of the Press** is a voluntary, unincorporated association of reporters and editors that works to defend the First Amendment rights and freedom of information interests of the news media. The Reporters Committee has provided representation, guidance and research in First Amendment and Freedom of Information Act litigation since 1970.

**Reuters America LLC** ("Reuters") is the world's largest independent international news agency, reaching more than a billion people every day. Its coverage includes international politics, business, sports and

42

entertainment; Reuters also publishes market data and intelligence to global business and finance consumers.

The **Society of Professional Journalists** ("SPJ") is dedicated to improving and protecting journalism. It is the nation's largest and most broad-based journalism organization, dedicated to encouraging the free practice of journalism and stimulating high standards of ethical behavior. Founded in 1909 as Sigma Delta Chi, SPJ promotes the free flow of information vital to a well-informed citizenry; works to inspire and educate the next generation of journalists; and protects First Amendment guarantees of freedom of speech and press.

**Tribune Company** is one of the country's leading multimedia companies, operating businesses in publishing, digital and broadcasting. In publishing, Tribune's leading daily newspapers include the Chicago Tribune, Los Angeles Times, The Baltimore Sun, Sun Sentinel (South Florida), Orlando Sentinel, Hartford Courant, The Morning Call and Daily Press. The company's broadcasting group operates 42 television stations, WGN America on national cable and Chicago's WGN-AM. Popular news and information websites, including www.chicagotribune.com and

www.latimes.com, complement Tribune's print and broadcast properties and extend the company's nationwide audience.

**Washington City Paper**, founded in 1981, is an alternative media company located in Washington D.C. City Paper serves as the definitive local guide to cultural and civic life in the District. Beyond helping people make the most of D.C., City Paper's dedication to groundbreaking reporting of local affairs reflects a strong commitment to the watchdog role of the alternative press. City Paper places serious emphasis on storytelling, employing some of the best writers in the industry.

WP Company LLC (d/b/a **The Washington Post**) publishes one of the nation's most prominent daily newspapers, as well as a website, www.washingtonpost.com, that is read by an average of more than 20 million unique visitors per month.

## CERTIFICATE OF SERVICE

I hereby certify that on April 2, 2014, copies of the foregoing were served by CM/ECF and first-class mail upon the following counsel:

Louis G. Adolfsen
S. Dwight Stephens
Melito & Adolfsen PC
233 Broadway
New York, New York 10279
(212) 238-8900
*Counsel for Yasser Abbas*

Kevin T. Baine
Adam R. Tarosky
James M. McDonald
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, DC 20005
202-434-5000
*Counsel for Foreign Policy Group, LLC*

Nathan E. Siegel
Seth D. Berlin
Shaina J. Ward
Levine Sullivan Koch & Schulz LLP
1899 L Street N.W.
Suite 200
Washington, DC 20036
202-508-1100
*Counsel for Jonathan Schanzer*

/s/ Laura R. Handman
Laura R. Handman