NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 13-7171

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

YASSER ABBAS,
PLAINTIFF-APPELLANT,

v.

FOREIGN POLICY GROUP, LLC; JONATHAN SCHANZER,
DEFENDANTS-APPELLEES.

ON APPEAL FROM AN ORDER OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

*AMICUS CURIAE* **BRIEF OF THE DISTRICT OF COLUMBIA
IN SUPPORT OF THE DISTRICT OF COLUMBIA ANTI-SLAPP ACT'S
APPLICABILITY IN FEDERAL DIVERSITY CASES**

IRVIN B. NATHAN
Attorney General for the District of Columbia

ARIEL B. LEVINSON-WALDMAN
Senior Counsel to the Attorney General

TODD S. KIM
Solicitor General

LOREN L. ALIKHAN
Deputy Solicitor General

REBECCA P. KOHN
Assistant Attorney General

Office of the Attorney General
441 4th Street, NW, Suite 600S
Washington, D.C. 20001
(202) 724-6630
ariel.levinson-waldman@dc.gov

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

A. *Parties and amici*.—The parties are: Mr. Yasser Abbas (Plaintiff-Appellant); Foreign Policy Group, LLC (Defendant-Appellee); and Mr. Jonathan Schanzer (Defendant-Appellee).

*Amici* include: The District of Columbia and "Media Amici" (Advance Publications, Inc.; American Society of News Editors; The Associated Press; Association of Alternative Newsmedia; The Association of American Publishers; Bloomberg L.P.; Center for Public Integrity; Dow Jones & Company, Inc.; The Economist Newspaper Limited; The E.W. Scripps Company; Fox Entertainment Group, Inc.; Gannet Co., Inc.; Hearst Corporation; The McClatchy Company; Media Law Resource Center; The National Press Club; National Press Photographers Association; National Public Radio, Inc.; NBCUniversal Media LLC; News Corporation; The New York Times Company; Newspaper Association of America; Online News Association; Online Publishers Association; Pro Publica, Inc.; Reporters Committee for Freedom of the Press; Society of Professional Journalists; Thomson Reuters Corporation; Tribune Company; The Washington City Paper; and The Washington Post).

B. *Ruling under review*.—The ruling under review is the District Court's September 27, 2013 Order granting the Defendant's special motion to dismiss

pursuant to the District's Anti-SLAPP Act and denying Defendant's motion to dismiss pursuant to Rule 12(b)(6) as moot.

C. *Related cases*.—None.

**TABLE OF CONTENTS**

INTEREST OF *AMICUS CURIAE* AND OVERVIEW ............................................1

ARGUMENT ......................................................................................................2

    I.     The Act Applies In Federal Diversity Actions. ......................................2

        A.    The Act and the Federal Rules can operate side by side without conflict. ........................................................................3

             1.    A federal court sitting in diversity is bound to apply an otherwise applicable state law unless there is an unavoidable, direct collision between a federal rule and a state rule. ...............................................................3

             2.    The Act and the Federal Rules of Civil Procedure do not conflict. .......................................................................6

                    a.    The Act confers substantive protections. ...............7

                    b.    The Act addresses a different question than Rules 12 or 56. .......................................................9

                    c.    Under any viable reading of *Shady Grove*, the Act does not answer the same question as Rules 12 or 56 or conflict with either of those rules. ..................................................................16

                    d.    The district court's analysis in *3M* is unpersuasive. ......................................................20

        B.    Application of the Act in federal court serves *Erie*'s twin aims. .........................................................................25

CONCLUSION .................................................................................................28

**TABLE OF AUTHORITIES\***

*Cases*

*3M Co v. Boulter*, 842 F. Supp. 2d 85 (D.D.C. 2012).................................. 11, 20-23

*\*Abbas v. Foreign Policy Grp.*, 12-1565, 2013 WL 5410410 (D.D.C. Sept. 27, 2013) .......................................................................................20

*\*Answering Service, Inc. v. Egan*, 728 F.2d 1500 (D.C. Cir. 1984) ................5, 6, 14

*Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003) ..........................................................8

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).....................................................22

*Boley v. Atlantic Monthly Group*, 950 F. Supp. 2d 249 (D.D.C. 2013) .............11, 20

*\*Burke v. Air Serv. Int'l, Inc.*, 685 F.3d 1102 (D.C. Cir. 2012)..................... 2-3, 5, 25

*\*Burlington N. R.R. Co. v. Woods*, 480 U.S. 1 (1987) ............................. 4, 15, 20-21

*Callaway v. Hamilton Nat'l Bank of Wash.*, 195 F.2d 556 (D.C. Cir. 1952) ...........21

*Carter v. State Farm Mut. Auto. Ins.*, 808 A.2d 466 (D.C. 2002) ......................... 7-8

*Cohen v. Beneficial Life Indus. Loan Corp.*, 337 U.S. 541 (1949)......................4, 14

*\*Dean v. NBC Universal*, No. 2011 CA 006055 B, Order 2 (D.C. Sup. Ct. June 25, 2012) .......................................................................................27

*\*Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)......................................................2

*\*Farah v. Esquire Magazine, Inc.*, 863 F. Supp. 2d 29 (D.D.C. 2013).............11, 20

*Farrall v. D.C. Amateur Athletic Union*, 153 F.2d 647 (D.C. Cir. 1946) ................21

*Gallup v. Caldwell*, 120 F.2d 90 (3d Cir. 1941).......................................................21

---

\*       Authorities upon which we chiefly rely are marked with asterisks.

*Garman v. Campbell Cnty. Sch. Dist. No. 1*, 630 F.3d 977 (10th Cir. 2010)...........17

*\*Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415 (1996) .................3, 14, 17, 19

*Gaylord Ent. Co. v. Thompson*, 958 P.2d 128 (Okla. 1998).......................................8

*\*Godin v. Schencks*, 629 F.3d 79 (1st Cir. 2010) ......................... 7, 10-13, 17, 19, 25

*Graham-Sult v. Clainos*, 11-16779, 2014 WL 444153 (9th Cir. 2014)......................8

*Hanna v. Plumer*, 380 U.S. 460 (1965).....................................................2, 4, 15, 26

*Henry v. Lake Charles Am. Press LLC*, 566 F.3d 164 (5th Cir. 2009)................... 7-8

*Hilton v. Hallmark Cards*, 599 F.3d 894 9th Cir. 2009) .........................................24

*Leimer v. State Mut. Life Assurance Co.*, 108 F.2d 302 (8th Cir. 1940).................21

*Liberty Synergistics Inc. v. Microflo Ltd.*, 718 F.3d 138 (2d Cir. 2013) ............... 6-7

*\*Makaeff v. Trump Univ., LLC*, 715 F.3d 254, (9th Cir. 2013) ........ 10, 12, 23-24, 26

*Mann v. Nat'l Review, Inc.*, 2012 CA 008263 B (D.C. Super. Ct. January 22, 2014) ....................................................................................................................9

*Marks v. United States*, 430 U.S. 188 (1977) .........................................................18

*Metabolife Int'l Inc. v. Wornick*, 264 F.3d 832 (9th Cir. 2001)..........................20, 23

*Nat'l War Labor Bd. v. Montgomery Ward & Co.*, 144 F.2d 528 (D.C. Cir. 1944) .21

*Novak v. Capital Mgmt. & Dev. Corp.*, 452 F.3d 902 (D.C. Cir. 2006)................7, 9

*Palmer v. Hoffman*, 318 U.S. 109 (1943) ................................................................4

*Retained Realty, Inc. v. McCabe*, 376 Fed. Appx. 52 (2d Cir. 2010).......................17

*Sack v. Low*, 478 F.2d 360 (2d Cir. 1973) ..............................................................24

*\*Semtek Int'l. Inc. v. Lockheed Martin Corp.*, 531 U.S. 497 (2001) ...................................................................................3, 13-14, 17-19, 23

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 130 S. Ct. 1431 (2010) ...................................................................2, 4-5, 7, 13, 15-19, 21

*Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22 (1988)..........................................4, 15

*Thomas v. Fry's Electronics, Inc.*, 400 F.3d 1206 (9th Cir. 2005) ..........................24

*United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963 (9th Cir. 1999) ...........................................................................7, 9, 12, 14, 26

*United States v. Stover*, 329 F.3d 859, 872 (D.C. Cir. 2003) ...................................25

*Walker v. Armco Steel Corp.*, 446 U.S. 740 (1980) .................................. 2-5, 14, 25

*Walko Corp. v. Burger Chef Systems, Inc.*, 554 F.2d 1165 (D.C. Cir. 1977) ...........25

## Constitutional Provisions

U.S. Const. amend. VII ...............................................................................................25

## Statutes and Regulations

28 U.S.C. § 2072 ...................................................................................................2, 3, 23

*D.C. Code § 16-5502, *et seq.* ............................................................. 1, 8-9, 11, 16

*Fed. R. Civ. P. 12...................................................................................................10

Fed. R. Civ. P. 12(d) advisory committee's notes ............................................... 21-22

* Fed. R. Civ. P. 41...................................................................................................24

* Fed. R. Civ. P. 56..................................................................................................10

*Legislative History*

*Council of the District of Columbia, Committee on Public Safety and the Judiciary, Report on Bill 18-893, the "Anti-SLAPP Act of 2010" (Nov. 18, 2010) ..............................................................................1, 8, 19


*Other*

27A Tracy Bateman Farrell, et al., Federal Procedure, Lawyers Ed. § 62:557 (Mar. 2012) ...................................................................................24

Colin Quinlan*, Erie and the First Amendment: State Anti-SLAPP Laws in Federal Court After Shady Grove*, 114 Colum. L. Rev. 367 (2014).................................... 8-9

# GLOSSARY

| | |
|---|---|
| SLAPP | Strategic Lawsuits Against Public Participation. |
| The Act | Anti-SLAPP Act of 2010, D.C. Code § 16-5501 *et seq.* |
| Committee Report | Council of the District of Columbia, Committee on Public Safety and the Judiciary, Report on Bill 18-893, the Anti-SLAPP Act of 2010 (Nov. 18, 2010) |

## INTEREST OF *AMICUS CURIAE* AND OVERVIEW

This appeal presents the question whether the free speech rights-implementing protections of the Anti-SLAPP Act of 2010, D.C. Code § 16-5501 *et seq.* ("the Act") (copy at Addendum 2), apply in federal diversity cases. The District of Columbia government has a considerable interest in ensuring that they do, just as they apply in the local courts. The Act was enacted by the Council of the District of Columbia to address the public and private harms from lawsuits that are wielded to chill the speech of those who would otherwise speak out on a matter of public interest. Council of the District of Columbia, Committee on Public Safety and the Judiciary, Report on Bill 18-893, the Anti-SLAPP Act of 2010 ("Comm. Rep.") at 4 (Nov. 18, 2010) (copy provided at Addendum 1). To address those harms, the Council provided a qualified immunity from suit for defendants subjected to claims arising from conduct in furtherance of the right of advocacy on issues of public interest where a plaintiff cannot show likelihood of success on the merits, and when dismissal under that standard is granted, authorized reasonable attorneys' fees are to be awarded in the court's discretion against the filer of the suit. D.C. Code §§ 16-5502, 16-5504.

Plaintiff-Appellant Yasser Abbas argued below that the Act does not apply in federal court proceedings where the basis of the court's subject matter jurisdiction is the diversity of the parties' citizenship. This argument, if adopted, would unjustifiably undermine the substantive policy goals of the District and promote forum-shopping.

The district court expressly and correctly rejected this argument, and held that the Act applies in this diversity action. This Court should affirm that holding.

**ARGUMENT**

**I. The Act Applies In Federal Diversity Actions.**

Under the *Erie* doctrine, federal courts are required to "'apply state substantive law and federal procedural law' when sitting pursuant to their diversity jurisdiction." *Burke v. Air Serv. Int'l, Inc.*, 685 F.3d 1102, 1107 (D.C. Cir. 2012) (quoting *Hanna v. Plumer*, 380 U.S. 460, 465 (1965)); *see Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). The Supreme Court "has evolved a set of tests to determine whether a law is substantive or procedural for *Erie* purposes." *Burke*, 685 F.3d at 1107. There are two steps to the governing test.

Under the first step, the "question" is whether there is an applicable federal rule or statute, the "scope" of which is "sufficiently broad to control the issue before the Court." *Id.* at 1107-08 (quoting *Walker v. Armco Steel Corp.*, 446 U.S. 740, 749-50 (1980)). "If there is, the Federal Rule or statute governs, state law notwithstanding, '*unless* it exceeds statutory authorization or Congress's rulemaking power.'" *Id.* (quoting *Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 130 S. Ct. 1431, 1437 (2010)) (emphasis added). The analysis thus must account for the Rules Enabling Act's command that the Federal Rules of Civil Procedure (and the Federal Rules of Evidence) "shall not abridge, enlarge or modify any substantive right." 28 U.S.C.

§ 2072(b).  If the federal rule, properly construed, and the state-level law at issue "can exist side by side . . . each controlling its own intended sphere of coverage without conflict," then a court must proceed to the second step of the test.  *Burke*, 685 F.3d at 1108 (quoting *Walker*, 446 U.S. at 752).

Under the second step, the federal court must apply the relevant District of Columbia or state law so long as "the failure to enforce state law would disserve the so called twin aims of the *Erie* rule: discouragement of forum-shopping and avoidance of inequitable administration of the laws."  *Id.* (internal quotation marks omitted).

Under this test, the Act applies here.

**A.    The Act and the Federal Rules can operate side by side without conflict.**

1.    A federal court sitting in diversity is bound to apply an otherwise applicable state law unless there is an unavoidable, direct collision between a federal rule and a state rule.

The parties' briefs provide limited discussion of the doctrinal framework that governs this Court's analysis of whether a true, unavoidable conflict exists for *Erie* purposes.  The District addresses this critical issue here.

In the seven-plus decades since it decided *Erie*, the Supreme Court has consistently applied state law in diversity actions except where confronted with an unavoidable, direct conflict between the federal procedural rule and the state law in question.  *See Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 509 (2001); *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 439 (1996); *Walker*, 446 U.S. at

3

753; *Cohen v. Beneficial Life Indus. Loan Corp.*, 337 U.S. 541, 557 (1949); *Palmer v. Hoffman*, 318 U.S. 109, 118 (1943). In the few exceptional cases where the Court *has* refused to apply the state law in question in a diversity action, it has in each instance explained how the related federal procedural rule could not be fairly interpreted to accommodate the state law. *See, e.g.*, *Hanna*, 380 U.S. at 470 (because Federal Rule of Civil Procedure 4(d)(1) provided "with unmistakable clarity . . . that in-hand service is not required in federal courts," while the relevant state rule provided explicitly that service *must* be "by delivery in hand," a "clash [was] unavoidable" between the federal and state rules, and thus the federal rule controlled); *Burlington N. R.R. Co. v. Woods*, 480 U.S. 1, 7 (1987) (two unavoidable conflicts between Federal Rule of Appellate Procedure 38 and the state law at issue precluded application of the state rule); *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 31 (1988) (because the application of the state law would "defeat [the] command" of the federal law, they could not exist in a diversity action "'side by side . . . each controlling its own sphere of coverage without conflict'" (quoting *Walker*, 446 U.S. at 752)).

Most recently, in *Shady Grove*, the Court reaffirmed that a truly unavoidable conflict will mean that an on-point federal rule controls, so long as the federal procedural rule does not exceed the Rules Enabling Act's ban on expanding or abridging substantive rights. *Shady Grove* explained the Court's numerous prior opinions *applying* state law in diversity actions this way: "[E]ach [of those cases]

4

involved a Federal Rule that we concluded could fairly be read not to 'control the issue' addressed by the pertinent state law, thus avoiding a 'direct collision' between federal and state law." 130 S. Ct. at 1442 n.8 (quoting *Walker*, 446 U.S. at 750). In *Shady Grove* itself, the New York statute by its terms *precluded* plaintiffs seeking a statutory penalty from proceeding in a class action, but Federal Rule of Civil Procedure 23 provides that class actions "may be maintained" if the Rule's prerequisites are met. 130 S. Ct. at 1436 n.2. Because the state statutory rule, if it applied, would have stripped the explicit procedural right of proceeding with a class action from plaintiffs in that federal court diversity action, the Court found a conflict, since "[b]y its terms, the [state] provision precludes a plaintiff from 'maintaining a class action seeking statutory penalties.'" *Id.* at 1439 (internal brackets omitted). Appropriately, it applied the federal rule. *Id.*

This Court's precedents evaluating a claimed conflict between a federal rule and a District rule have echoed the Supreme Court's teachings that courts should find conflict in this context only where it is unavoidable, and should strive to construe the respective rules in harmony. In a trilogy of decisions over 35 years, this Court in each of *Walko Corp. v. Burger Chef Systems, Inc.*, 554 F.2d 1165 (D.C. Cir. 1977); *Answering Service, Inc. v. Egan*, 728 F.2d 1500 (D.C. Cir. 1984); and *Burke* held that the federal rule in question did not control the resolution of the issue, and applied the District rule. The District is unaware of a *single* decision in which this Court *ever*

5

refused to apply an otherwise applicable state or District law on the grounds that a federal rule overrode the state or District law.

*Answering Service* is particularly instructive on this point. There, the issue was whether a party was barred by *res judicata* from bringing a claim for wrongful involvement in litigation. 728 F.2d at 1501. Federal Rules of Civil Procedure 13, 14, and 18 describe the claims, cross-claims, and counterclaims that must be joined to an original claim. The key issue was whether to apply the District's common-law rule requiring separation between certain cross-claims and a certain new claim. *Id.* at 1503-04. The Federal Rules, as construed by this Court, did not expressly address this question, and the Court held the state rule applicable under *Erie. Id.* at 1505. The Court emphasized that its analysis "harmonizes, rather than severs, the Federal Rules of Civil Procedure and the" applicable state law, keeping mindful that while the federal rules "are of course presumptively valid," they must be interpreted consistently with *Erie* and with "the limited mandate of the Rules Enabling Act." *Id.* at 1506. Here, the Act and the Federal Rules can readily be harmonized, as explained by Appellees and as we now further show.

> 2.     The Act and the Federal Rules of Civil Procedure do not conflict.

The Act and the Federal Rules can operate in tandem and without conflict. Indeed, all four of the federal courts of appeals to have examined whether a state anti-SLAPP statute applies in federal diversity actions have held that it does. *Liberty*

*Synergistics Inc. v. Microflo Ltd.*, 718 F.3d 138, 148 (2d Cir. 2013); *Godin v. Schencks*, 629 F.3d 79, 92 (1st Cir. 2010); *Henry v. Lake Charles Am. Press LLC*, 566 F.3d 164, 168-69 (5th Cir. 2009); *United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 973 (9th Cir. 1999). The answer is the same for the Act here.

Rules 12 and 56 do not "attempt[ ] to answer the same question as" the Act, *Shady Grove*, 130 S. Ct. at 1437, because they are "addressed to different (but related) subject-matters." *Godin*, 629 F.3d at 88. The Act "on its face is not addressed to either of these procedures, which are general federal procedures governing all categories of cases." *Id.* Rather, it focuses on District-law "claims based on a defendant's petitioning activity." *Id.* The Act applies only to meritless claims challenging defendants' exercise of their constitutional speech rights, and for those claims it codifies a targeted, qualified immunity from suit.

a. The Act confers substantive protections.

In diversity cases, this Court's self-described "duty . . . is to achieve the same outcome we believe would result if the District of Columbia Court of Appeals considered this case." *Novak v. Capital Mgmt. & Dev. Corp.*, 452 F.3d 902, 907 (D.C. Cir. 2006). The D.C. Court of Appeals seeks in its statutory construction to "effectuate the legislative purpose, as determined by a reading of the legislative history or by an examination of the statute as a whole." *Carter v. State Farm Mut.*

7

*Auto. Ins.*, 808 A2d 466, 471 (D.C. 2002) (internal quotation marks and citations omitted). Here, from the language, structure, and legislative history of the Act, the Council's purpose to implement free speech rights through the Act is clear. The text of the Act provides a qualified immunity—or at least a protection akin to a qualified immunity—from suit for claims that arise from conduct in furtherance of the right of advocacy on issues of public interest where a plaintiff cannot show it is "likely to succeed on the merits." D.C. Code § 16-5502(b).

State Anti-SLAPP statutes may codify an implied substantive immunity by using a burden-shifting provision combined with a provision calling for dismissal or striking of the plaintiff's claim once the burden shifts back to the plaintiff. Courts have repeatedly recognized an implied immunity in anti-SLAPP statutes regardless of the fact that the statute being analyzed does not use the word "immunity." *See, e.g.*, *Batzel v. Smith*, 333 F.3d 1018, 1025 (9th Cir. 2003); *Henry*, 566 F.3d at 177; *Gaylord Ent. Co. v. Thompson*, 958 P.2d 128, 144 (Okla. 1998).

And, although the Act's language and structure is itself indicative of the intent to provide immunity, the legislative purpose could not have been more clearly stated in the Council's unanimous Committee Report. This report made express that the Council was "*follow[ing] the lead of other jurisdictions, which have similarly extended absolute or qualified immunity to individuals engaging in protected actions.*" Comm. Rep. at 4 (emphasis added); *see also* Colin Quinlan, *Erie and the First*

*Amendment: State Anti-SLAPP Laws in Federal Court After Shady Grove*, 114 Colum. L. Rev. 367, 398 (2014) (following analysis of the Anti-SLAPP laws of over 30 states and the District and concluding that "Anti-SLAPP protections resemble . . . qualified immunity, as they provide immunity from suit rather than a mere defense to liability"). In particular, the statutory standard that the Council employed is very similar to the standard in the California statute that the Ninth Circuit had repeatedly—for over a decade at the time of the Council's deliberations—recognized as having enacted an implied immunity from suit. *Compare Newsham*, 190 F.3d at 971, *with* D.C. Code §§ 16-5502(a)-(b).

For these reasons, the D.C. Court of Appeals would construe the Act to provide qualified immunity protections from suit from persons who are subject to a meritless suit arising out of their free speech activities.[1] This Court, accordingly, should also do so. *See Novak*, 452 F.3d at 907.

b. The Act addresses a different question than Rules 12 or 56.

The key issue under the Act's immunity scheme is whether the defendant invoking the Act has established in its motion an immunity from suit, based on both the demonstration that the claim arises out of constitutionally protected speech activity

---

[1] We note that an appeal of the Superior Court's denial of a special motion to dismiss in *Mann v. Nat'l Review, Inc.*, 2012 CA 008263 B (D.C. Super. Ct. January 22, 2014), was filed on January 30, 2014, and is currently pending in the D.C. Court of Appeals (No. 14-CV-126).

and a lack of showing of likelihood on the merits. There is nothing in the text or scope of Rules 12 or 56 addressing this "question" for *Shady Grove* purposes. And, likewise, there is nothing in the Act that addresses the issue encompassed by Rules 12 or 56.

"Rules 12 and 56 do not provide that a plaintiff is entitled to maintain his suit if their requirements are met; instead, they provide various theories upon which a suit may be disposed of before trial." *Makaeff v. Trump Univ., LLC*, 736 F.3d 1180, 1182 (9th Cir. 2013). Rule 12(b)(6) allows a defendant to assert a failure to state a claim upon which relief can be granted. The Act "provides a mechanism for a defendant to move to dismiss a claim on an entirely different basis [than the federal rules]: that the claims in question rest on the defendant's protected petitioning conduct and that the plaintiff cannot meet the special" standard that the District has "created to protect such petitioning activity against lawsuits." *Godin*, 629 F.3d at 89.

The Act likewise provides mechanisms for relief for a defendant in a SLAPP case different in kind from that provided in the federal summary judgment rule. Rule 56(a) allows parties to move for summary judgment, and requires a court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Act "serves the entirely distinct function," *Godin*, 629 F.3d at 89, of protecting those specific defendants that have been (a) targeted with litigation on the basis of their

protected speech, (b) where the plaintiff has not shown a likelihood of success on the merits. *See* D.C. Code § 16-5502(a)-(b).

The Act, like its state counterparts, does *not* "seek to displace the Federal Rules or have Rules 12(b)(6) and 56 cease to function." *Godin*, 629 F.3d at 88; *Boley v. Atlantic Monthly Group*, 950 F. Supp. 2d 249, 254 (D.D.C. 2013); *Farah v. Esquire Magazine, Inc.,* 863 F. Supp. 2d 29, *aff'd on other grounds*, 736 F.3d 528 (D.C . Cir. 2013). As a practical matter, the Act and these federal rules can operate in tandem— both when a party's special motion to dismiss fails and when it succeeds.

If defendants invoking the Act's protections *fail* to convince the presiding judge that their statements are "in furtherance of the right of advocacy on issues of public interest," or if the court concludes that "the claim is likely to succeed on the merits," such a ruling would do nothing to interfere with the disposition of outstanding or subsequent motions filed by a defendant under Rule 12 or by either party under Rule 56. For example, in *3M Co. v. Boulter*, the defendants' motion under the Act was denied, but their 12(b)(6) motion was granted as to every claim but one. 842 F. Supp. 2d 85, 113-20 (D.D.C. 2012). Similarly, in *Farah*, the district court granted dismissal under both Rule 12(b)(6) and the Act. 863 F. Supp. 2d at 41. While these two different motions may if granted both have the same effect in terms of the claims in question being dismissed, because of the fees and costs provisions associated with the anti-SLAPP motion (provisions long recognized as substantive for *Erie* purposes),

11

the two dismissal standards neither turn on the same questions nor necessarily have the same consequences.[2] *See, e.g.*, *Newsham*, 190 F.3d 963 (evaluating grant of Rule 12(b) motion to dismiss for lack of jurisdiction *and* denial of California anti-SLAPP act motion). Again, the Act and the Federal Rules can operate in tandem, each in their own respective sphere.

A *successful* special motion to dismiss a claim under the Act may obviate the district court's consideration of further dismissal motions, as it did in this case, but this does not amount to a conflict with Rules 12 and 56, any more than those rules conflict with each other. The Act here simply provides an additional, independent basis upon which a court may dispose of a claim prior to trial. *See Godin*, 629 F.3d at 89 (Maine anti-SLAPP law "provides a mechanism for a defendant to move to dismiss a claim on an entirely different basis [than Rule 12(b)(6)]"). "By creating a separate and additional theory upon which certain kinds of suits may be disposed of before trial," the District's Anti-SLAPP Act "supplements rather than conflicts with the federal rules." *Trump* at 1182; *cf. Godin*, 629 F.3d at 91 ("Neither Rule 12 nor Rule 56 of the federal rules of procedure purport to be so broad as to preclude additional

---

[2]     For this reason, the District agrees with Appellees' point (Appellees' Br. 37) that only if the Court concludes that the district court's dismissal under the Act was erroneous should it separately consider whether to order the district court to dismiss the Complaint under Federal Rule of Procedure Rule 12(b)(6). The district court denied the Rule 12(b)(6) motion as moot.

mechanisms meant to curtail rights-dampening litigation through the modification of pleading standards."). Indeed as a practical matter, as cases like *3M* and *Farah* show, it can reasonably be expected that defendants will regularly invoke both bases for dismissal and district courts will entertain both without the analysis under the Act displacing or necessarily becoming co-extensive with the analysis under Rule 12(b)(6). They are different motions, designed for some common and some different purposes, evaluated under different standards and with a different range of attendant consequences where the motion is granted.

The Act's protections touch on *procedural issues*, which they must since they are targeted at the evil the Council sought to address—the abuse of the court system to silence speech on topics of public interest. This does not constitute a conflict with the Federal Rules, nor does the Act's application conflict with *Erie* principles. Just like the Maine statute held applicable by the First Circuit, the Act (1) "shifts the burden to plaintiff to defeat the special motion"; (2) "determines the scope of plaintiff's burden"; and (3) "allows courts to award attorney's fees and costs to a defendant that successfully brings a special motion to dismiss." *Godin*, 629 F.3d at 89 & n.15.

The partial similarity between the Act's provisions "and Rules 12 and 56 as mechanisms to efficiently dispose of meritless claims before trial occurs does not resolve the issue" of whether the Act may be applied under *Erie. Godin*, 629 F.3d at 89 n.16 (citing *Shady Grove*, 130 S. Ct. at 1441 n.7 (in turn relying on *Semtek*, 531

U.S. at 504)); *see also Newsham*, 190 F.3d at 972 ("This commonality of purpose, however, does not constitute a direct collision—there is no indication that Rules 8, 12 and 56 were intended to occupy the field with respect to pre-trial procedures aimed at weeding out meritless claims."). The fact that Rules 12 and 56 and the Act each provide pathways to a common possible result, the claim being resolved in a defendant's favor, does not present a "conflict" any more than the application in diversity of state law provisions touching on *procedural* matters that the Supreme Court has previously approved. *Cohen* applied a state law requiring the plaintiff class to post security as a prerequisite to bringing an action—notwithstanding that Federal Rule 23 addressed the same topic. 337 U.S. at 556-57. *Walker* applied state law to determine when an action commences notwithstanding that Federal Rule 3 defined when an action is "commenced." 446 U.S. at 753. *Gasperini* applied the state standard of judicial review to be applied to challenges to the size of a jury's damages award, notwithstanding Federal Rule 59's command that new trials may be granted "'for any of the reasons for which new trials have heretofore been granted . . . in the courts of the United States.'" 518 U.S. at 433. And, applying Supreme Court precedent, this Court in *Answering Service* applied the District law that required separation between certain cross claims and a certain new claim, notwithstanding the fact that Rules 13, 14, and 18 describe the claims, cross-claims, and counterclaims that must be joined to an original claim. *See* 728 F.2d at 1506.

14

Likewise, there is no conflict here in the relevant sense. A conflict that requires a federal court to disregard state law in a diversity action is, instead, a conflict that directly prevents the federal court from obeying two commands at once. Thus, for example, *Hanna* explained that the clash was "unavoidable" between Rule 4(d)(1)'s command that "in-hand service is not required in federal courts" and the state rule's requirement that service *must* be "by delivery in hand." 380 U.S. at 470. In *Stewart*, the federal statute for transfer requests required "an individualized, case-by-case consideration of convenience and fairness" and could not exist in a diversity action "side by side" with the state law's "*categorical* policy disfavoring forum-selection clauses," 487 U.S. at 29-31 (emphasis added and internal quotation marks omitted), the application of which would "defeat [the] command" of the federal law, *id.* at 31. *Burlington* similarly stressed that a federal appellate court, if both Federal Rule of Appellate Procedure 38 and the state law applied, would be faced with a situation where it would be forced to either exceed its authority under Rule 38 or to violate the mandatory state-law obligation, so as a practical matter, the two laws could not operate "side by side." 480 U.S. at 7-8. Likewise, in *Shady Grove*, the Court confronted a situation where a judge faced with plaintiffs demanding state statutory penalties and seeking class certification must either refuse to apply Rule 23's express "may maintain" language or certify a class in violation of state law. 130 S. Ct. at 1442. Again, there was no practical way for the trial judge to apply both laws "side

15

by side." *Id.* at 1442. Here, as discussed above, there is a straightforward way for trial courts to do so.[3]

      c.  Under any viable reading of *Shady Grove*, the Act does not answer the same question as Rules 12 or 56 or conflict with either of those rules.

Even if this Court perceives ambiguity as to whether Federal Rules 12 and 56 permit the Act's application, precedent and *Erie* principles require the Court to read the rules and the Act to avoid conflict because a fair reading of them allows it to do so. Section II.A, the portion of Justice Scalia's *Shady Grove* opinion that garnered five Justices' votes, echoes the decisions that it built on, and instructs federal courts to "read an ambiguous Federal Rule to avoid substantial variations [in outcomes] between state and federal litigation." *Shady Grove*, 130 S. Ct. at 1441 n.7 (internal quotation marks omitted).

---

[3] Further, and contrary to Mr. Abbas's claim that the Act's provisional stay of discovery during the pendency of a motion pursuant to the Act "collides with the discovery-allowing aspects of Rule 56" (Appellant's Br. 26), there is no reason to think that the Act's discovery-related provisions will preclude discovery upon a showing of need, akin to Rule 56's operation, under the Act's provision that "[w]hen it appears likely that targeted discovery will enable the plaintiff to defeat the motion and that the discovery will not be unduly burdensome, the court may order that specified discovery be conducted." D.C. Code § 16-5502(c)(2). Further, *how* the Act should be applied, which is really the question related to discovery, is different and logically subsequent to the question of *whether* the Act should be applied, which is the issue presented here. And, in any event, Mr. Abbas sought no discovery, so the issue is not presented in this case.

The concurrence by Justice Stevens (who provided the fifth vote) in *Shady Grove* is to the same effect. *See id.* at 1451 n.5 (Stevens, J., concurring). Echoing prior Supreme Court majority opinions, the concurrence further requires that "federal rules must be interpreted with some degree of 'sensitivity to important state interests and regulatory policies.'" *Id.* at 1449 (quoting *Gasperini*, 518 U.S. at 427 n.7). "When a federal rule appears to abridge, enlarge, or modify a substantive right, federal courts must consider whether the rule can reasonably be interpreted to avoid that impermissible result," by a reasonable "saving construction" to ensure no violation of the Enabling Act's mandate that federal rules "shall not" alter "*any* substantive right." *Id.* at 1452 (citing *Semtek*, 531 U.S. at 503).

There is some question how best to read *Shady Grove*. The First Circuit applied the standard from both Section II.A and the concurring opinion in construing Rules 12 and 56. 629 F.3d at 86-87. The Second Circuit has, in evaluating an alleged conflict with a federal rule, applied the standard from Section II.A. *See Retained Realty, Inc. v. McCabe*, 376 Fed. App'x 52, 55-56 & n.1 (2d Cir. 2010). The Tenth Circuit has, in contrast, applied in its evaluation of a federal rule only the standard from Justice Stevens's concurrence to both the conflict analysis and the Rules Enabling Act analysis. *See Garman v. Campbell Cnty. Sch. Dist. No. 1*, 630 F.3d 977, 983-84 (10th Cir. 2010).

17

This Court, however, need not resolve here for purposes of *Marks v. United States*, 430 U.S. 188, 193 (1977), the precise scope of *Shady Grove*'s precedential meaning or the significance of the differences between Section II.A and Justice Stevens' concurring opinion. The Court need not decide *that* question in *this* case, because the result is the same under any viable interpretation of *Shady Grove.*

For the reasons set out above, Rules 12 and 56, read in a straightforward way, do not "attempt[ ] to answer the same question as" the Act, and thus there is no conflict under the standard laid out in Section II.A of *Shady Grove*, 130 S. Ct. at 1437. And under that same standard, to the extent the Court finds any ambiguity on the issue, it "should read an ambiguous Federal Rule to avoid 'substantial variations [in outcomes] between state and federal litigation.'" *Id.* at 1441 n.7 (quoting *Semtek*, 531 U.S. at 504). That directive points to a conclusion of no conflict here because, if the Court were to hold that the federal rules forbid application of the Act, the Act's speech-rights-focused immunity, burden-shifting, and cost-and fee-related protections would be available in the District in the Superior Court, but not available whatsoever in federal court, a variation that is surely "substantial." *Id.*

If, like the Tenth Circuit, this Court were to apply Justice Stevens's opinion as controlling the conflict inquiry, the result is the same. First, on a straightforward comparison of the rules, again, there is no conflict because Rules 12 and 56 do not address the relevant question of whether immunity is warranted, and thus dismissal

ensues. But to the extent the Court finds any ambiguity, it should apply the approach counseled by Justice Stevens, interpreting federal rules "with some degree of 'sensitivity to important state interests and regulatory policies.'" *Id.* at 1449 (Stevens, J., concurring) (quoting *Gasperini*, 518 U.S. at 427 n.7)). The Council's stated interest in the Act of ensuring that "District residents are not intimidated or prevented, because of abusive lawsuits, from engaging in political or public policy debates," Comm. Rep. 4, is surely an important regulatory interest for these purposes and would compel reading the ambiguity, to the extent it exists, so that the federal rules permit operation of the Act's protections. By contrast, the state law in *Shady Grove* did *not* have legislative history showing it was adopted for primarily substantive reasons. *Id.* at 1458-59 (Stevens, J., concurring).

And even if, after an initial conflicts analysis, the Court still thought that Rules 12 or 56 covered the issue, Justice Stevens's standard would compel using a saving construction for the federal rules and applying the Act's speech rights implementing protections, thus avoiding a Rules Enabling Act problem. *See id.* at 1452 (citing *Semtek*, 531 U.S. at 503). Because the Act is, like its state analogs, "'so intertwined with a state right or remedy that it functions to define the scope of the state-created right,' it cannot be displaced by Rule 12(b)(6) or Rule 56." *Godin*, 629 F.3d at 89 (quoting *Shady Grove*, 130 S. Ct. at 1452 (Stevens, J., concurring)).

d. The district court's analysis in *3M* is unpersuasive.

Finally, as the decision below concluded and as every single district judge in this Circuit to have evaluated the question has concluded, the *3M* decision on which Mr. Abbas heavily relies was simply wrongly decided. *See Abbas v. Foreign Policy Group*, 12-1565, 2013 WL 5410410, at *5 (D.D.C. Sept. 27, 2013); *Boley*, 950 F. Supp. 2d at 254; *Farah*, 863 F. Supp. 2d at 29. To conclude that Rules 12 and 56 conflict with application of the Act in diversity matters, the district court in *3M* relied principally on: (i) the Supreme Court's decisions in *Burlington* and *Shady Grove*; (ii) Advisory Committee Notes to the 1946 Amendments to the Federal Rules of Civil Procedure, and on several decisions from the 1940s and 1950s of this Court and other circuits applying Rules 12 and 56; and (iii) the Ninth Circuit's decision in *Metabolife Int'l Inc. v. Wornick*, 264 F.3d 832 (9th Cir. 2001). *See 3M*, 842 F. Supp. 2d 85, 96-112. None of those authorities supports, let alone compels, the conclusion reached by the district court in that case.

First, as discussed above, Supreme Court precedent permits a federal court sitting in diversity to refuse to apply the state law only where there is a true conflict between the state law and a federal law or procedural rule. Thus, for example, *Burlington* posited a situation where a federal appellate court in deciding whether to impose penalties would be forced to either exceed its authority under Federal Rule of Appellate Procedure 38 or to violate a mandatory state-law obligation; as a practical

matter, the two laws could not operate "side by side." 480 U.S. at 7. Similarly, in *Shady Grove*, as discussed above, there was no practical way for the trial judge to apply Federal Rule 23 and the state law "side by side." 130 S. Ct. at 1441-42. Here, there is no such unavoidable clash in application of the Act.

Second, the historical materials and mid-20th Century decisions relied on by *3M* likewise do not support its conclusion that Rules 12 and 56 are intended to "occupy the field" of weeding out meritless claims. *See 3M*, 842 F. Supp. 2d at 109 (citing, *e.g.*, *Callaway v. Hamilton Nat'l Bank of Wash.*, 195 F.2d 556 (D.C. Cir. 1952); *Farrall v. D.C. Amateur Athletic Union*, 153 F.2d 647 (D.C. Cir. 1946); *Nat'l War Labor Bd. v. Montgomery Ward & Co.*, 144 F.2d 528 (D.C. Cir. 1944); *Gallup v. Caldwell*, 120 F.2d 90 (3d Cir. 1941); *Leimer v. State Mut. Life Assurance Co.*, 108 F.2d 302 (8th Cir. 1940); Fed. R. Civ. P. 12(d) advisory committee's notes). *3M* characterized—unjustifiably in our view—the Advisory Committee's notes as "clearly explain[ing] that Rule 12(d) links Rule 12 with Rule 56 to provide the exclusive means for federal courts to use to rule upon a pretrial motion to adjudicate a case on the merits based on matters outside the complaint." *3M*, 842 F. Supp. 2d at 98. This is not a persuasive reading of the notes, or of the cases it applied or those cases cited by *3M* decided shortly after the 1946 amendments.

21

As an initial matter, neither the notes themselves nor a single case cited by *3M* uses the term "exclusive" in this context; that is solely the court's gloss. Nor does the text of Rules 12 or 56 use that term or its substantive equivalent.

Further, the 1946 Advisory Committee notes simply indicate what has today become black-letter law—that motions filed under the Federal Rules that seek judgment based on the evidence, whether they are styled as "speaking motions" or they otherwise attach factual averments such as affidavits that go to the merits of the allegations, should generally be treated as motions for summary judgment. It is by now an "unobjectionable proposition that when a complaint adequately states a claim, it may not be dismissed" under Rule 12 "based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or fail to prove his claim to the satisfaction of the factfinder." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 n.8 (2007). This proposition is concededly accurate, but does nothing to support *3M*'s extrapolation from it.

Similarly, the cases cited in *3M* do not speak at all to the question of when courts may dismiss cases upon motions based on state-created substantive immunity rules. None of the 1946 advisory committee language or early cases construing the 1946 amendments cited in *3M* discussed statute-based immunities implementing substantive rights, and none says *anything* to negate through the Federal Rules the application of a state-created right that is narrowly targeted to constitutionally-

22

protected activities.  Indeed, that is not surprising, as Congress spoke to *that* question separately and well before the 1946 amendments, enacting in 1934 the command in the Rules Enabling Act, applicable ever since, that "the Rules 'shall not abridge, enlarge, or modify any substantive right.'"  *Semtek*, 531 U.S. at 503 (quoting 28 U.S.C. § 2072(b)).

Third, and contrary to *3M*'s intimation, Ninth Circuit precedent does not support its conclusion.  *Metabolife* does *not* stand for the proposition, ascribed to it by *3M*, that "Rules 12 and 56 are so broad as to cover or answer the same question as the California statute."  842 F. Supp. 2d at 109 n.19.

Rather, the Ninth Circuit has *repeatedly* and consistently held in a line of cases stretching back over a decade, including before and after *Metabolife*, and as recently as earlier this year, that California's Anti-SLAPP immunity squarely applies in federal court.  *See Graham-Sult v. Clainos*, 2014 WL 444153, at *5 (9th Cir. Feb. 5, 2014); *Makaeff v. Trump Univ., LLC*, 715 F.3d 254 (9th Cir.), *reh'g en banc denied*, 736 F.3d 1180, 1187 (9th Cir. 2013) (four judges concurring in the denial of rehearing en banc stating that through Anti-SLAPP laws, state legislatures "decided to impose substantive limitations on certain state law actions" and that "refusing to recognize these limitations is bad policy," and that "if we ignore how states have limited actions under their own laws, we not only flush away state legislatures' considered decisions on matters of state law, but we also put the federal courts at risk of being swept away

23

in a rising tide of frivolous state actions that would be filed in our circuit's federal courts"); *Newsham*, 190 F.3d at 970-73; *Hilton v. Hallmark Cards*, 599 F.3d 894, 900 n.2 (9th Cir. 2009); *Thomas v. Fry's Elecs., Inc.*, 400 F.3d 1206, 1207 (9th Cir. 2005); *Batzel*, 333 F.3d at 1025-26.

Finally, and contrary to Mr. Abbas's argument and the unfounded conclusion of the district court in *3M*, the Act's provision that dismissal under Section 16-5502 shall be with prejudice does not conflict with Federal Rule of Civil Procedure 41(b). Rule 41(b) says in relevant part that "[u]nless the dismissal order states otherwise, a dismissal under this subdivision . . . and any dismissal not under this rule—except one for lack of jurisdiction, improper venue, or failure to join a party under Rule 19— operates as an adjudication on the merits." As has been long recognized, the Rule simply sets forth a default rule of construction of otherwise ambiguous language in dismissal orders; contrary to the *3M* court's understanding, it does not by its terms independently confer discretion on district courts. *See* 27A Tracy Bateman Farrell, et al., Federal Procedure, Lawyers Ed. § 62:557 (Mar. 2012); *see also Sack v. Low*, 478 F.2d 360, 364 (2d Cir. 1973). Because there is no discretion separately provided to federal district judges in Rule 41(b), there is none that could be taken away by the Act to provide the basis of any purported conflict.

*   *   *

24

For all of these reasons, the Federal Rules of Civil Procedure can operate in tandem with the Act. There is no unavoidable conflict between the Act and the Federal Rules.[4]

**B.        Application of the Act in federal court serves *Erie*'s twin aims.**

Because the Federal Rules and the Act can "exist side by side, . . . each controlling its own intended sphere of coverage without conflict," the second step of the governing test is triggered, and the Act must be applied in this diversity action if its application will serve *Erie*'s twin aims. *Burke*, 685 F.3d at 1108 (quoting *Walker*, 446 U.S. at 752).

---

[4]        Nor is there any validity to Mr. Abbas's position on appeal that the Act violates the Seventh Amendment. In the first place, the argument was not pressed by Mr. Abbas or considered by the court below, and it "cannot be considered for the first time on appeal." *United States v. Stover*, 329 F.3d 859, 872 (D.C. Cir. 2003). But even if the facial challenge was not forfeited, it plainly fails. There is no reason to assume, as Mr. Abbas appears to, that the D.C. Court of Appeals, when it eventually construes the Act, would find an implied *requirement* in the Act that the trial judge resolve a disputed issue of material fact. *Accord Godin*, 629 F.3d at 90 n.18 (noting concern that Maine Anti-SLAPP Act "to the extent it might be read to allow, contrary to [Fed. R. Civ. P.] 56, a judge to resolve a disputed material issue of fact, would then preclude a party from exercising its Seventh Amendment rights to trial by jury on disputed issues of material fact," and declining to reach the issue, concluding that the statute is "a relatively young statute, not much construed by the state courts, and there is no reason to think the state courts would construe [it] so as to be incompatible with the Seventh Amendment"). And indeed, the court below engaged in no such weighing, nor does it appear that any trial court has in granting dismissal under the Act since it took effect in 2011.

It plainly will. Applying the Act in federal diversity cases promotes the twin aims of *Erie*: avoidance of inequitable administration of the law and discouragement of forum-shopping.

First, there should not be *fewer* protections available in federal court for individuals subjected to meritless suits designed to silence constitutionally protected speech than in Superior Court. This is especially so since the plaintiff largely chooses the forum. *See Hanna*, 380 U.S. at 467.

Second, and relatedly, if plaintiffs are subject to the heightened burden of proof set forth in the Act if they file their case in local court, but can avoid being subject to those standards if they file in federal court, that result will promote *precisely* the type of forum-shopping *Erie* was designed to avoid. *See, e.g.*, *Newsham*, 190 F.3d at 973. "Without anti-SLAPP protections in federal courts, SLAPP plaintiffs would have an incentive to file or remove to federal courts strategic, retaliatory lawsuits that are more likely to have the desired effect of suppressing a SLAPP defendant's speech-related activities. Encouraging such forum-shopping chips away at 'one of the modern cornerstones of our federalism.'" *Makaeff*, 736 F.3d at 1187 (quoting *Hanna*, 380 U.S. at 474 (Harlan, J., concurring)).

Indeed, unlike the usual twin-aims analysis where the court must predict the relatively likelihood of forum-shopping resulting from the failure to apply state laws, here, the evidence is concrete. Such forum-shopping has *already* occurred in the

26

District as a result of *3M.* *See Dean v. NBC*, No. 2011 CA 006055 B , Order 2 (D.C. Sup. Ct. June 25, 2012) (copy at Addendum 3) ("Plaintiffs [alleging defamation against a journalist and other parties] wish to discontinue this case and pursue the same matter in Federal Court because [of the district court's *3M* decision]."). The twin-aims analysis thus confirms that the Act's protections should apply here.

## CONCLUSION

The district court's holding that the Act applies in this federal diversity action should be affirmed.

Respectfully submitted,

IRVIN B. NATHAN
Attorney General for the District of Columbia

/s/ Ariel B. Levinson- Waldman
ARIEL B. LEVINSON-WALDMAN
Senior Counsel to the Attorney General

TODD S. KIM
Solicitor General

LOREN L. ALIKHAN
Deputy Solicitor General

REBECCA P. KOHN[*]
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
441 4th Street, NW, Suite 600S
Washington, D.C. 20001
April 2014       (202) 724-6630

---

[*]      Admitted only in New York. Supervised by Ariel Levinson-Waldman, a member of the District of Columbia Bar and admitted to the U.S. Court of Appeals for the District of Columbia Circuit.

# ADDENDUM

1. Council of the District of Columbia, Committee on Public Safety and the Judiciary, Report on Bill 18-893, the "Anti-SLAPP Act of 2010" (Nov. 18, 2010)

2. D.C. Code § 16-5502 *et seq.*

3. *Dean v. NBC Universal*, No. 2011 CA 006055 B, Order 2 (D.C. Sup. Ct. June 25, 2012)

# COUNCIL OF THE DISTRICT OF COLUMBIA
# COMMITTEE ON PUBLIC SAFETY AND THE JUDICIARY
# COMMITTEE REPORT
1350 Pennsylvania Avenue, NW, Washington, DC 20004     2010 NOV 19 PM 12:33

TO:          All Councilmembers

FROM:        Councilmember Phil Mendelson,
             Chairman, Committee on Public Safety and the Judiciary

DATE:        November 18, 2010

SUBJECT:     Report on Bill 18-893, "Anti-SLAPP Act of 2010"

The Committee on Public Safety and the Judiciary, to which Bill 18-893, the "Anti-SLAPP Act of 2010" was referred, reports favorably thereon with amendments, and recommends approval by the Council.

## CONTENTS

| | | |
|---|---|---|
| I. | Background and Need | 1 |
| II. | Legislative Chronology | 5 |
| III. | Position of the Executive | 6 |
| IV. | Comments of Advisory Neighborhood Commissions | 6 |
| V. | Summary of Testimony | 6 |
| VI. | Impact on Existing Law | 7 |
| VII. | Fiscal Impact | 7 |
| VIII. | Section-by-Section Analysis | 7 |
| IX. | Committee Action | 8 |
| X. | Attachments | 8 |

## I.       BACKGROUND AND NEED

Bill 18-893, the Anti-SLAPP Act of 2010, incorporates substantive rights with regard to a defendant's ability to fend off lawsuits filed by one side of a political or public policy debate aimed to punish or prevent the expression of opposing points of view. Such lawsuits, often referred to as strategic lawsuits against public participation -- or SLAPPs -- have been increasingly utilized over the past two decades as a means to muzzle speech or efforts to petition the government on issues of public interest. Such cases are often without merit, but achieve their filer's intention of punishing or preventing opposing points of view, resulting in a chilling effect on the exercise of constitutionally protected rights. Further, defendants of a SLAPP must dedicate a substantially amount of money, time, and legal resources. The impact is not limited to named defendants willingness to speak out, but prevents others from voicing concerns as well. To remedy this Bill 18-893 follows the model set forth in a number of other jurisdictions, and mirrors language found in federal law, by incorporating substantive rights that allow a defendant to more expeditiously, and more equitably, dispense of a SLAPP.

**History of Strategic Lawsuits against Public Participation:**

In what is considered the seminal article regarding SLAPPs, University of Denver College of Law Professor George W. Pring described what was then (1989), considered to be a growing litigation "phenomenon":

> Americans are being sued for speaking out politically. The targets are typically not extremists or experienced activists, but normal, middle-class and blue-collar Americans, many on their first venture into the world of government decision making. The cases are not isolated or localized aberrations, but are found in every state, every government level, every type of political action, and every public issue of consequence. There is no dearth of victims: in the last two decades, thousands of citizens have been sued into silence.[1]

These lawsuits, Pring noted, are typically an effort to stop a citizen from exercising their political rights, or to punish them for having already done so. To further identify the problem, and be able to draw possible solutions, Pring engaged in a nationwide study of SLAPPs with University of Denver sociology Professor Penelope Canan.

Pring and Canan's study established the base criteria of a SLAPP as: (1) a civil complaint or counterclaim (for monetary damages and/or injunction); (2) filed against non-governmental individuals and/or groups; (3) because of their communications to a government body, official or electorate; and (4) on an issue of some public interest or concern.[2] The study of 228 SLAPPs found that, despite constitutional, federal and state statute, and court decisions that expressly protect the actions of the defendants, these lawsuits have been allowed to flourish because they appear, or are camouflaged by those bringing the suit, as a typical tort case. The vast majority of the cases identified by the study were brought under legal charges of defamation (such as libel and slander), or as such business torts as interference with contract.[3]

In identifying possible solutions to litigation aimed at silencing public participation, Pring paid particular attention to a 1984 opinion of the Colorado Supreme Court establishing a new rule for trial courts to allow for dismissal motions for SLAPP suits.[4] In recognition of the

---

[1] George W. Pring, *SLAPPS: Strategic Lawsuits against Public Participation*, Pace Env. L. Rev, Paper 132, 1 (1989), *available at* http://digitalcommons.pace.edu/cgi/viewcontent.cgi?article=1122&context=envlaw (last visited Nov. 17, 2010).

[2] *Id.* at 7-8.

[3] *Id.* at 8-9.

[4] Protect Our Mountain Env't, Inc. v. District Court, 677 P.2d 1361 (Colo. 1984). The three-prong test develop by the court requires:

> When [ ] a plaintiff sues another for alleged misuse or abuse of the administrative or judicial
> processes of government, and the defendant files a motion to dismiss by reason of the
> constitutional right to petition, the plaintiff must make a sufficient showing to permit the court to
> reasonably conclude that the defendant's petitioning activities were not immunized from liability
> under the First Amendment because: (1) the defendant's administrative or judicial claims were
> devoid of reasonable factual support, or, if so supportable, lacked any cognizable basis in law for
> their assertion; and (2) the primary purpose of the defendant's petitioning activity was to harass the

growing problem of SLAPPs, a number of jurisdictions have, legislatively, created a similar special motion to dismiss in order to expeditiously, and more fairly deal with SLAPPs. According to the California Anti-SLAPP Project, a public interest law firm and policy organization dedicated to fighting SLAPPs in California, as of January 2010 there are approximately 28 jurisdictions in the United States that have adopted anti-SLAPP measures. Likewise, there are nine jurisdictions (not including the District of Columbia) that are currently considering legislation to address the issue. Also, one other jurisdiction has joined Colorado in addressing SLAPPs through judicial doctrine.[5]

This issue has also recently been taken up by the federal government, with the introduction of the H.R. 4363, the Citizen Participation Act of 2009. This legislation would provide certain procedural protections for any act in furtherance of the constitutional right of petition or free speech, and specifically incorporate a special motion to dismiss for SLAPPs.[6]

**SLAPPs in the District of Columbia:**

Like the number of jurisdictions that have sensed the need to address SLAPPs legislatively, the District of Columbia is no stranger to SLAPPs. The American Civil Liberties Union of the Nation's Capital (ACLU), in written testimony provided to the Committee (attached), described two cases in which the ACLU was directly involved, as counsel for defendants, in such suits against District residents.[7]

The actions that typically draw a SLAPP are often, as the ACLU noted, the kind of grassroots activism that should be hailed in our democracy. In one of the examples provided, the ACLU discussed the efforts of two Capitol Hill advocates that opposed the efforts of a certain developer. When the developer was unable to obtain a building permit, the developer sued the activists and the community organization alleging they "conducted meetings, prepared petition drives, wrote letters and made calls and visits to government officials, organized protests, organized the preparation and distribution of ... signs, and gave statements and interviews to various media."[8] Such activism, however, was met with years of litigation and, but for the ACLU's assistance, would have resulted in outlandish legal costs to defend. Though the actions

---

plaintiff or to effectuate some other improper objective; and (3) the defendant's petitioning activity had the capacity to adversely affect a legal interest of the plaintiff.

*Id.* at 1369.

[5] California Anti-SLAPP Project (CASP) website, Other states: Statutes and cases, *available at* http://www.casp.net/statutes/menstate.html (last visited Nov. 11, 2010).

[6] http://www.thomas.gov/cgi-bin/bdquery/D?d111:1:./temp/~bdLBBX:@@@L&summ2=m&|/home/LegislativeData.php|

[7] *Bill 18-893, Anti-SLAPP Act of 2010: Public Hearing of the Committee on Public Safety and the Judiciary*, Sept. 17, 2010, at 2-3 (written testimony Arthur B. Spitzer, Legal Director, American Civil Liberties Union of the Nation's Capital).

[8] *Id.* at 2 (quoting from lawsuit in *Father Flanagan's Boys Home v. District of Columbia et al.*, Civil Action No. 01-1732 (D.D.C)).

of these participants should have been protected, they, and any others who wished to express opposition to the project, were met with intimidation.

What has been repeated by many who have studied this issue, from Pring on, is that the goal of the litigation is not to win the lawsuit but punish the opponent and intimidate them into silence. As Art Spitzer, Legal Director for the ACLU, noted in his testimony "[*l*]*itigation itself* is the plaintiff's weapon of choice."[9]

### District Anti-SLAPP Act:

In June 2010, legislation was introduced to remedy this nationally recognized problem here in the District of Columbia. As introduced, this measure closely mirrored the federal legislation introduced the previous year. Bill 18-893 provides a defendant to a SLAPP with substantive rights to expeditiously and economically dispense of litigation aimed to prevent their engaging in constitutionally protected actions on matters of public interest.

Following the lead of other jurisdictions, which have similarly extended absolute or qualified immunity to individuals engaging in protected actions, Bill 18-893 extends substantive rights to defendants in a SLAPP, providing them with the ability to file a special motion to dismiss that must be heard expeditiously by the court. To ensure a defendant is not subject to the expensive and time consuming discovery that is often used in a SLAPP as a means to prevent or punish, the legislation tolls discovery while the special motion to dismiss is pending. Further, in recognition that SLAPP plaintiffs frequently include unspecified individuals as defendants -- in order to intimidate large numbers of people that may fear becoming named defendants if they continue to speak out -- the legislation provides an unnamed defendant the ability to quash a subpoena to protect his or her identity from disclosure if the underlying action is of the type protected by Bill 18-893. The legislation also allows for certain costs and fees to be awarded to the successful party of a special motion to dismiss or a special motion to quash.

Bill 18-893 ensures that District residents are not intimidated or prevented, because of abusive lawsuits, from engaging in political or public policy debates. To prevent the attempted muzzling of opposing points of view, and to encourage the type of civic engagement that would be further protected by this act, the Committee urges the Council to adopt Bill 18-893.

## II.      LEGISLATIVE CHRONOLOGY

June 29, 2010      Bill 18-893, the "Anti-SLAPP Act of 2010," is introduced by Councilmembers Cheh and Mendelson, co-sponsored by Councilmember M. Brown, and is referred to the Committee on Public Safety and the Judiciary.

---

[9] *Id.* at 3.

| July 9, 2010 | Notice of Intent to act on Bill 18-893 is published in the *District of Columbia Register*. |
| August 13, 2010 | Notice of a Public Hearing is published in the *District of Columbia Register*. |
| September 17, 2010 | The Committee on Public Safety and the Judiciary holds a public hearing on Bill 18-893. |
| November 18, 2010 | The Committee on Public Safety and the Judiciary marks-up Bill 18-893. |

### III.  POSITION OF THE EXECUTIVE

The Executive provided no witness to testify on Bill 18-893 at the September 17, 2010 hearing. The Office of the Attorney General provided a letter subsequent to the hearing stating the need to review the legislation further.

### IV.  COMMENTS OF ADVISORY NEIGHBORHOOD COMMISSIONS

The Committee received no testimony or comments from Advisory Neighborhood Commissions.

### V.  SUMMARY OF TESTIMONY

The Committee on Public Safety and the Judiciary held a public hearing on Bill 18-893 on Friday, September 17, 2010. The testimony summarized below is from that hearing. A copy of submitted testimony is attached to this report.

***Robert Vinson Brannum, President, D.C. Federation of Civic Associations, Inc.,*** testified in support of Bill 18-893.

***Ellen Opper-Weiner, Public Witness,*** testified in support of Bill 18-893. Ms. Opper-Weiner recounted her own experience in SLAPP litigation, and suggested several amendments to strengthen the legislation.

***Dorothy Brizill, Public Witness,*** testified in support of Bill 18-893. Ms. Brizill recounted her own experience in SLAPP litigation. She stated that the legislation is the next step in advancing free speech in the District of Columbia.

***Arthur B. Spitzer, Legal Director, American Civil Liberties Union of the Nation's Capital,*** provided a written statement in support of the purpose and general approach of Bill 18-

893, but suggested several changes to the legislation as introduced. A copy of this statement is attached to this report.

Although no Executive witness presented testimony, Attorney General for the District of Columbia, Peter Nickles, expressed concern that certain provisions of the bill might implicate the Home Rule Act prohibition against enacting any act with respect to any provision of Title 11 of the D.C. Official Code. A copy of his letter is attached to this report.

## VI. IMPACT ON EXISTING LAW

Bill 18-893 adds new provisions in the D.C. Official Code to provide an expeditious process for dealing with strategic lawsuits against public participation (SLAPPs). Specifically, the legislation provides a defendant to a SLAPP with substantive rights to have a motion to dismiss heard expeditiously, to delay burdensome discovery while the motion to dismiss is pending, and to provide an unnamed defendant the ability to quash a subpoena to protect his or her identity from disclosure if the underlying action is of the type protected by Bill 18-893. The legislation also allows for the costs of litigation to be awarded to the successful party of a special motion to dismiss created under this act.

## VII. FISCAL IMPACT

The attached November 16, 2010 Fiscal Impact Statement from the Chief Financial Officer states that funds are sufficient to implement Bill 18-893. This legislation requires no additional funds or staff.

## VIII. SECTION-BY-SECTION ANALYSIS

Several of the changes to the Committee Print from Bill 18-893 as introduced stem from the recommendations of the American Civil Liberties Union of the Nation's Capital (ACLU). For a more thorough explanation of these changes, see the September 17, 2010 testimony of the ACLU attached to this report.

| | |
|---|---|
| Section 1 | States the short title of Bill 18-893. |
| Section 2 | Incorporates definitions to be used throughout the act. |
| Section 3 | Creates the substantive right of a party subject to a claim under a SLAPP suit to file a special motion to dismiss within 45 days after service of the claim. |

*Subsection* (a)  Creates a substantive right of a defendant to pursue a special motion to dismiss for a lawsuit regarding an act in furtherance of the right of advocacy on issues of public interest.

*Subsection* (b)  Provides that, upon a prima facie showing that the activity at issue in the litigation falls under the type of activity protected by this act, the court shall dismiss the case unless the responding party can show a likelihood of succeeding upon the merits.

*Subsection* (c)  Tolls discovery proceedings upon the filing of a special motion to dismiss under this act. As introduced the legislation permitted an exemption to this for good cause shown. The Committee Print has tightened this language in this provision so that the court may permit specified discovery if it is assured that such discovery would not be burdensome to the defendant.

*Subsection* (d)  Requires the court to hold an expedited hearing on a special motion to dismiss filed under this act.

As introduced, the Committee Print contained a subsection (e) that would have provided a defendant with a right of immediate appeal from a court order denying a special motion to dismiss. While the Committee agrees with and supports the purpose of this provision, a recent decision of the DC Court of Appeals states that the Council exceeds its authority in making such orders reviewable on appeal.[10] The dissenting opinion in that case provides a strong argument for why the Council should be permitted to legislate this issue. However, under the majority opinion the Council is restricted from expanding the authority of District's appellate court to hear appeals over non-final orders of the lower court. The provision that has been removed from the bill as introduced would have provided an immediate appeal over a non-final order (a special motion to dismiss).

<u>Section 4</u>  Creates a substantive right of a person to pursue a special motion to quash a subpoena aimed at obtaining a persons identifying information relating to a lawsuit regarding an act in furtherance of the right of advocacy on issues of public interest.

*Subsection* (a)  Creates the special motion to quash.

*Subsection* (b)  Provides that, upon a prima facie showing that the underlying claim is of the type of activity protected by this act, the court shall grant the special

---

[10] *See* Stuart v. Walker, 09-CV-900 (DC Ct of App 2010) at 4-5.

motion to quash unless the responding party can show a likelihood of succeeding upon the merits.

Section 5          Provides for the awarding of fees and costs for prevailing on a special motion to dismiss or a special motion to quash. The court is also authorized to award reasonable attorney fees where the underlying claim is determined to be frivolous.

Section 6          Provides exemptions to this act for certain claims.

Section 7          Adopts the Fiscal Impact Statement.

Section 8          Establishes the effective date by stating the standard 30-day Congressional review language.

## IX.    COMMITTEE ACTION

On November 18, 2010, the Committee on Public Safety and the Judiciary met to consider Bill 18-893, the "Anti-SLAPP Act of 2010." The meeting was called to order at 1:50 p.m., and Bill 18-893 was the fourth item on the agenda. After ascertaining a quorum (Chairman Mendelson and Councilmembers Alexander, Cheh, and Evans present; Councilmembers Bowser absent), Chairman Mendelson moved the print, along with a written amendment to repeal section 3(e) of the circulated draft print, with leave for staff to make technical changes. After an opportunity for discussion, the vote on the print was three aye (Chairman Mendelson and Councilmembers Evans and Cheh), and one present (Councilmember Alexander). Chairman Mendelson then moved the report, with leave for staff to make technical and editorial changes. After an opportunity for discussion, the vote on the report was three aye (Chairman Mendelson and Councilmembers Evans and Cheh), and one present (Councilmember Alexander). The meeting adjourned at 2:15 p.m.

## X.    ATTACHMENTS

1.    Bill 18-893 as introduced.

2.    Written testimony and comments.

3.    Fiscal Impact Statement

4.    Committee Print for Bill 18-893.

# COUNCIL OF THE DISTRICT OF COLUMBIA
## 1350 Pennsylvania Avenue, N.W.
### Washington, D.C. 20004

**Memorandum**

---

To:        Members of the Council

From:      Cynthia Brock-Smith, Secretary to the Council

Date:      July 7, 2010

Subject:   (Correction)
           Referral of Proposed Legislation


Notice is given that the attached proposed legislation was introduced in the Legislative Meeting on Tuesday, June 29, 2010. Copies are available in Room 10, the Legislative Services Division.


TITLE: "Anti-SLAPP Act of 2010", B18-0893


INTRODUCED BY: Councilmembers Cheh and Mendelson

CO-SPONSORED BY: Councilmember M. Brown


The Chairman is referring this legislation to the Committee on Public Safety and the Judiciary.


Attachment


cc: General Counsel
    Budget Director
    Legislative Services

Councilmember Phil Mendelson

Councilmember Mary M. Cheh

A BILL

_____

IN THE COUNCIL OF THE DISTRICT OF COLUMBIA

_____

Councilmembers Mary M. Cheh and Phil Mendelson introduced the following bill, which was referred to the Committee on _____.

To provide a special motion for the quick and efficient dismissal of strategic lawsuits against public participation (SLAPPs), to stay proceedings until the motion is considered, to provide a motion to quash attempts to seek personally identifying information; and to award the costs of litigation to the successful party on a special motion.

BE IT ENACTED BY THE COUNCIL OF THE DISTRICT OF COLUMBIA,

That this act may be cited as the "Anti-SLAPP Act of 2010".

Sec. 2. Definitions.

For the purposes of this Act, the term:

(1) "Act in furtherance of the right of free speech" means:

(A) Any written or oral statement made:

(i) In connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law;

(ii) In a place open to the public or a public forum in connection with an issue of public interest; or

1

(B) Any other conduct in furtherance of the exercise of the constitutional right to petition the government or the constitutional right of free expression in connection with an issue of public interest.

(2) "Issue of public interest" means an issue related to health or safety; environmental, economic or community well-being; the District government; a public figure; or a good, product or service in the market place. The term "issue of public interest" shall not be construed to include private interests, such as statements directed primarily toward protecting the speaker's commercial interests rather than toward commenting on or sharing information about a matter of public significance.

(3) "Claim" includes any civil lawsuit, claim, complaint, cause of action, cross-claim, counterclaim, or other judicial pleading or filing requesting relief.

(4) "Government entity" means the Government of the District of Columbia and its branches, subdivisions, and departments.

Sec. 3. Special Motion to Dismiss.

(a) A party may file a special motion to dismiss any claim arising from an act in furtherance of the right of free speech within 45 days after service of the claim.

(b) A party filing a special motion to dismiss under this section must make a prima facie showing that the claim at issue arises from an act in furtherance of the right of free speech. If the moving party makes such a showing, the responding party may demonstrate that the claim is likely to succeed on the merits.

(c) Upon the filing of a special motion to dismiss, discovery proceedings on the claim shall be stayed until notice of entry of an order disposing of the motion, except that the court, for good cause shown, may order that specified discovery be conducted.

(d) The court shall hold an expedited hearing on the special motion to dismiss, and issue a ruling as soon as practicable after the hearing. If the special motion to dismiss is granted, dismissal shall be with prejudice.

(e) The defendant shall have a right of immediate appeal from a court order denying a special motion to dismiss in whole or in part.

Sec. 4. Special Motion to Quash.

(a) A person whose personally identifying information is sought, pursuant to a discovery order, request, or subpoena, in connection with an action arising from an act in furtherance of the right of free speech may make a special motion to quash the discovery order, request, or subpoena.

(b) The person bringing a special motion to quash under this section must make a prima facie showing that the underlying claim arises from an act in furtherance of the right of free speech. If the person makes such a showing, the claimant in the underlying action may demonstrate that the underlying claim is likely to succeed on the merits.

Sec. 5. Fees and costs.

(a) The court may award a person who substantially prevails on a motion brought under sections 3 or 4 of this Act the costs of litigation, including reasonable attorney fees.

(b) If the court finds that a motion brought under sections 3 or 4 of this Act is frivolous or is solely intended to cause unnecessary delay, the court may award reasonable attorney fees and costs to the responding party.

Sec. 6. Exemptions.

(a) This Act shall not apply to claims brought solely on behalf of the public or solely to enforce an important right affecting the public interest.

(b) This Act shall not apply to claims brought against a person primarily engaged in the business of selling or leasing goods or services, if the statement or conduct from which the claim arises is a representation of fact made for the purpose of promoting, securing, or completing sales or leases of, or commercial transactions in, the person's goods or services, and the intended audience is an actual or potential buyer or customer.

Sec. 7. Fiscal impact statement.

The Council adopts the fiscal impact statement in the committee report as the fiscal impact statement required by section 602(c)(3) of the District of Columbia Home Rule Act, approved December 24, 1973 (87 Stat. 813; D.C. Official Code § 1-206.02(c)(3)).

Sec. 8. Effective date.

This act shall take effect following approval by the Mayor (or in the event of veto by the Mayor, action by the Council to override the veto), a 30-day period of Congressional review as provided in section 602(c)(1) of the District of Columbia Home Rule Act, approved December 24, 1973 (87 Stat. 813; D.C. Official Code § 1-206.02(c)(1)), and publication in the District of Columbia Register.

Testimony of the
**American Civil Liberties Union
of the Nation's Capital**

by

Arthur B. Spitzer
Legal Director

before the

Committee on Public Safety and the Judiciary
of the
Council of the District of Columbia

on

Bill 18-893, the
"Anti-SLAPP Act of 2010"

September 17, 2010

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

The ACLU of the Nation's Capital appreciates this opportunity to testify on Bill 18-893. We support the purpose and the general approach of this bill, but we believe it requires some significant polishing in order to achieve its commendable goals.

## Background

In a seminal study about twenty years ago, two professors at the University of Denver identified a widespread pattern of abusive lawsuits filed by one side of a political or public policy dispute—usually the side with deeper pockets and ready access to counsel—to punish or prevent the expression of opposing points of view. They dubbed these "Strategic Lawsuits Against Public Participation," or "SLAPPs." *See* George W. Pring and Penelope Canan, SLAPPS: GETTING SUED FOR SPEAKING OUT (Temple University Press 1996). They pinpointed several criteria that identify a SLAPP:

    — The actions complained of "involve communicating with government officials, bodies, or the electorate, or encouraging others to do so." *Id.* at 150.

    — The defendants are "involved in speaking out for or against some issue under consideration by some level of government or the voters." *Id.*

1

— The legal claims filed against the speakers tend to fall into predictable categories such as defamation, interference with prospective economic advantage, invasion of privacy, and conspiracy. *Id.* at 150-51.

— The lawsuit often names "John or Jane Doe defendants." *Id.* at 151. "We have found whole communities chilled by the inclusion of Does, fearing 'they will add my name to the suit.'" *Id.*

The authors "conservatively estimate[d] that ... tens of thousands of Americans have been SLAPPed, and still more have been muted or silenced by the threat." *Id.* at xi. Finding that "the legal system is not effective in controlling SLAPPs," *id.*, they proposed the adoption of anti-SLAPP statutes to address the problem. *Id.* at 201.

Responding to the continuing use of SLAPPs by those seeking to silence opposition to their activities, twenty-six states and the Territory of Guam have now enacted anti-SLAPP statutes.[1]

The ACLU of the Nation's Capital has been directly involved, as counsel for defendants, in two SLAPPs involving District of Columbia residents.

In the first case, a developer that had been frustrated by its inability promptly to obtain a building permit sued a community organization (Southeast Citizens for Smart Development) and two Capitol Hill activists (Wilbert Hill and Ellen Opper-Weiner) who had opposed its efforts. The lawsuit claimed that the defendants had violated the developer's rights when they "conducted meetings, prepared petition drives, wrote letters and made calls and visits to government officials, organized protests, organized the preparation and distribution of ... signs, and gave statements and interviews to various media," and when they created a web site that urged people to "call, write or e-mail the mayor" to ask him to stop the project. The defendants' activities exemplified the kind of grassroots activism that should be hailed in a democracy, and the lawsuit was a classic SLAPP. The case was eventually dismissed, and the dismissal affirmed on appeal.[2] But the litigation took several years, and during all that time the defendants and their neighbors were worried about whether they might face liability. Because the ACLU represented the citizens and their organization at no charge, they were not financially harmed. But had they been required to retain paid counsel, the cost would have been substantial, and intimidating.

---

[1] Links to these statutes can be found at http://www.casp.net/menstate.html.

[2] *Father Flanagan's Boys Home v. District of Columbia, et al.*, Civil Action No. 01-1732 (D.D.C.), *aff'd*, 2003 WL 1907987 (No. 02-7157, D.C. Cir. 2003).

In the second case we represented Dorothy Brizill, who needs no introduction to this Committee. She was sued in Guam for defamation, invasion of privacy, and "interference with prospective business advantage," based on statements she made in a radio interview broadcast there about the activities of the gambling entrepreneur who backed the proposed 2004 initiative to legalize slot machines in the District of Columbia. This lawsuit was also a classic SLAPP, filed against her in the midst of the same entrepreneur's efforts to legalize slot machines on Guam, in an effort to silence her. And to intimidate his opponents, twenty "John Does" were also named as defendants. With the help of Guam's strong anti-SLAPP statute, the case was dismissed, and the dismissal was affirmed by the Supreme Court of Guam.[3] But once again, the litigation lasted more than two years, and had Ms. Brizill been required to retain paid counsel to defend herself, it would have cost her hundreds of thousands of dollars.

As professors Pring and Canan demonstrated, a SLAPP plaintiff's real goal is not to win the lawsuit but to punish his opponents and intimidate them and others into silence. *Litigation itself* is the plaintiff's weapon of choice; a long and costly lawsuit is a victory for the plaintiff even if it ends in a formal victory for the defendant. That is why anti-SLAPP legislation is needed: to enable a defendant to bring a SLAPP to an end quickly and economically.

## Bill 18-893

Bill 18-893 would help end SLAPPs quickly and economically by making available to the defendant a "special motion to dismiss" that has four noteworthy features:
- The motion must be heard and decided expeditiously.
- Discovery is generally stayed while the motion is pending.
- If the motion is denied the defendant can take an immediate appeal.
- Most important, the motion is to be granted if the defendant shows that he or she was engaged in protected speech or activity, unless the plaintiff can show that he or she is nevertheless likely to succeed on the merits.

Speaking generally, this is sensible path to the desired goal, and speaking generally, the ACLU endorses it. If a lawsuit looks like a SLAPP, swims like a SLAPP, and quacks like a SLAPP, then it probably is a SLAPP, and it is fair and reasonable to put the burden on the plaintiff to show that it isn't a SLAPP.

We do, nevertheless, have a number of suggestions for improvement, including a substantive change in the definition of the conduct that is to be protected by the proposed law.

---

[3] *Guam Greyhound, Inc. v. Brizill*, 2008 Guam 13, 2008 WL 4206682.

**Section 2(1).** The bill begins by defining the term "Act in furtherance of the right of free speech," which is used to signify the conduct that can be protected by a special motion to dismiss. In our view, it would be better to use a different term, because the "right of free speech" is already a term in very common use, with a broader meaning than the meaning given in this bill, and it will be impossible, or nearly so, for litigants, lawyers and even judges (and especially the news media) to avoid confusion between the common meaning of the "right of free speech" and the special, narrower meaning given to it in this bill. It would be akin to defining the term "fruit" to mean "a curved yellow edible food with a thick, easily-peeled skin." This specially-defined term deserves a special name that will not require a struggle to use correctly. We suggest "Act in furtherance of the right of advocacy on issues of public interest."

**Section 2(1)(A).** Because there is no conjunction at the end of section 2(1)(A)(i), the bill is ambiguous as to whether sections 2(1)(A)(i) and (ii) are conjunctive or disjunctive. That is, in order to be covered, must a statement be made "In connection with an ... official proceeding" *and* "In a place open to the public or a public forum in connection with an issue of public interest," or is a statement covered if it is made *either* "In connection with an ... official proceeding," *or* "In a place open to the public or a public forum in connection with an issue of public interest"?

We urge the insertion of the word "or" at the end of section 2(1)(A)(i) to make it clear that statements are covered in either case. A statement made "In connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law" certainly deserves anti-SLAPP protection whether it is made in a public place or in a private place. For example, a statement made to a group gathered by invitation in a person's living room, or made to a Councilmember during a non-public meeting, should be protected. Likewise, a statement made "In a place open to the public or a public forum in connection with an issue of public interest" deserves anti-SLAPP protection whether of not it is also connected to an "official proceeding." For example, statements by residents addressing a "Stop the Slaughterhouse" rally should be protected even if no official proceeding regarding the construction of a slaughterhouse has yet begun.[4]

---

[4] It appears that these definitions, along with much of Bill 18-893, were modeled on the Citizen Participation Act of 2009, H.R. 4364 (111th Cong., 1st Sess.), introduced by Rep. Steve Cohen of Tennessee (*available at* http://thomas.loc.gov/cgi-bin/query/z?c111:H.R.4364.IH:). In that bill it is clear that speech or activity that falls under any one of these definitions is covered.

4

**Section 2(1)(B).** Section 2(1)(B) expands the definition of protected activity to include "any other conduct in furtherance of the exercise of the constitutional right to petition the government or the constitutional right of free expression in connection with an issue of public interest." We fully agree with the intent of this provision, but we think it fails as a definition because it is backwards— it requires a court *first* to determine whether given conduct is protected by the Constitution *before* it can determine whether that conduct is covered by the Anti-SLAPP Act. But if the conduct is protected by the Constitution, then there is no need for the court to determine whether it is covered by the Anti-SLAPP Act: a claim arising from that conduct must be dismissed because the conduct is protected by the Constitution. And yet the task of determining whether given conduct is protected by the Constitution is often quite difficult, and can require exactly the kinds of lengthy, expensive legal proceedings (including discovery) that the bill is intended to avoid.

This very problem arose in the *Brizill* case, where the Guam anti-SLAPP statute protected "acts in furtherance of the Constitutional rights to petition," and Mr. Baldwin argued that the statute therefore provided no broader protection for speech than the Constitution itself provided. *See* 2008 Guam 13 ¶ 28. He argued, for example, that Ms. Brizill's speech was not protected by the statute because it was defamatory, and defamation is not protected by the Constitution. As a result, the defendant had to litigate the constitutional law of defamation on the way to litigating the SLAPP issues. This should not be necessary, as the purpose of an anti-SLAPP law is to provide broader protection than existing law already provides. Bill 18-893 should be amended to avoid creating the same problem here.[5]

We therefore suggest amending Section 2(1)(B) to say: "Any other expression or expressive conduct that involves petitioning the government or communicating views to members of the public in connection with an issue of public interest."

**Section 2(4).** Section 2(4) defines the term "government entity." But that term is never used in the bill. It should therefore be deleted.[6]

---

[5] The Supreme Court of Guam ultimately rejected the argument that "Constitutional rights" meant "constitutionally protected rights," *see id.* at ¶ 32, but that was hardly a foregone conclusion, and the D.C. Court of Appeals might not reach the same conclusion under Section 2(1)(B).

[6] The same term is defined in H.R. 4364, but it is then used in a section providing that "A government entity may not recover fees pursuant to this section."

**Section 3(b).** We agree with what we understand to be the intent of this provision, setting out the standards for a special motion to dismiss. But the text of this section fails to accomplish its purpose because it never actually spells out what a court is supposed to do. We suggest revising Section 3(b) as follows:

> (b) If a party filing a special motion to dismiss under this section makes a prima facie showing that the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest, then the motion shall be granted unless the responding party demonstrates that the claim is likely to succeed on the merits, in which case the motion shall be denied.

**Section 3(c).** We agree that discovery should be stayed on a claim as to which a special motion to dismiss has been filed. This is an important protection, for discovery is often burdensome and expensive. Because expression on issues of public interest deserves special protection, a plaintiff who brings a claim based on a defendant's expression on an issue of public interest ought to be required to show a likelihood of success on that claim without the need for discovery.

A case may exist in which a plaintiff could prevail on such a claim after discovery but cannot show a likelihood of success without discovery, but in our view the dismissal of such a hypothetical case is a small price to pay for the public interest that will be served by preventing the all-but-automatic discovery that otherwise occurs in civil litigation over the sorts of claims that are asserted in SLAPPs.

As an exception to the usual stay of discovery, Section 3(c) permits a court to allow "specified discovery" after the filing of a special motion to dismiss "for good cause shown." We agree that a provision allowing some discovery ought to be included for the exceptional case. But while the "good cause" standard has the advantage of being flexible, it has the disadvantage of being completely subjective, so that a judge who simply feels that it's unfair to dismiss a claim without discovery can, in effect, set the Anti-SLAPP Act aside and allow a case to proceed in the usual way. In our view, it would be better if the statute spelled out more precisely the circumstances under which discovery might be allowed, and also included a provision allowing the court to assure that such discovery would not be burdensome to the defendant. For example: "...except that the court may order that specified discovery be conducted when it appears likely that targeted discovery will enable the plaintiff to defeat the motion and that the discovery will not be unduly burdensome. Such an order may be conditioned upon the plaintiff paying any expenses incurred by the defendant in responding to such discovery."

Finally, we note that this section provides that discovery shall be stayed "until notice of entry of an order disposing of the motion." That language tracks H.R. 4364, but "notice of entry" of court orders is not part of D.C. Superior Court procedure. We suggest that the bill be amended to provide that "… discovery proceedings on the claim shall be stayed until the motion has been disposed of, including any appeal taken under section 3(e), …"

**Sections 3(d) and (e).** We agree that a special motion to dismiss should be expedited and that its denial should be subject to an interlocutory appeal. The Committee may wish to consider whether the Court of Appeals should also be directed to expedite its consideration of such an appeal. The D.C. Court of Appeals often takes years to rule on appeals.

**Section 4.** Section 4 is focused on the fact that SLAPPs frequently include unspecified individuals (John and Jane Does) as defendants. As observed by professors Pring and Canan, this is one of the tactics employed by SLAPP plaintiffs to intimidate large numbers of people, who fear that they may become named defendants if they continue to speak out on the relevant public issue.

There can be very legitimate purposes for naming John and Jane Does as defendants in civil litigation. The ACLU sometimes names John and Jane Does as defendants when it does not yet know their true identities—for example, when unknown police officers are alleged to have acted unlawfully.[7] It is therefore necessary to balance the right of a plaintiff to proceed against an as-yet-unidentified person who has violated his rights, and to use the court system to discover that person's identity, against the right of an individual not to be made a defendant in an abusive SLAPP that was filed for the purpose of retaliating against, or chilling, legitimate civic activity.

We believe that Section 4 strikes an appropriate balance by making available to a John or Jane Doe a "special motion to quash," protecting his or her identity from disclosure if he or she was acting in a manner that is protected by the Anti-SLAPP Act, and if the plaintiff cannot make the same showing of likely success on the merits that is required to defeat a special motion to dismiss.

Like Section 3(b), however, Section 4(b) never actually spells out what a court is supposed to do. We therefore suggest revising Section 4(b) in the same manner we suggested revising Section 3(b):

---

[7] *See, e.g., YoungBey v. District of Columbia, et al.*, No. 09-cv-596 (D.D.C.) (suing the District of Columbia, five named MPD officers, and 27 "John Doe" officers in connection with an unlawful pre-dawn SWAT raid of a District resident's home).

(b) If a person bringing a special motion to quash under this section makes a prima facie showing that the underlying claim arises from an act in furtherance of the right of advocacy on issues of public interest, then the motion shall be granted unless the party seeking his or her personally identifying information demonstrates that the underlying claim is likely to succeed on the merits, in which case the motion shall be denied.

**Section 6(a).** Section 6(a) provides that "This Act shall not apply to claims brought solely on behalf of the public or solely to enforce an important right affecting the public interest." This language is vague and tremendously broad. Almost any plaintiff can and will assert that he is bringing his claims "to enforce an important right affecting the public interest," and neither this bill nor any other source we know gives a court any guidance regarding what "an important right affecting the public interest" might be. The plaintiffs in the two SLAPP suits described above, in which the ACLU of the Nation's Capital represented the defendants, vigorously argued that they were seeking to enforce an important right affecting the public interest: the developer argued that it was seeking to provide housing for disadvantaged youth; the gambling entrepreneur argued that he was seeking to prevent vicious lies from affecting the result of an election.

Thus, this provision will almost certainly add an entire additional phase to the litigation of every SLAPP suit, with the plaintiff arguing that the anti-SLAPP statute does not even apply to his case because he is acting in the public interest. To the extent that courts accept such arguments, this provision is a poison pill with the potential to turn the anti-SLAPP statute into a virtually dead letter. At a minimum, it will subject the rights of SLAPP defendants to the subjective opinions of more than 75 different Superior Court judges regarding what is or is not "an important right affecting the public interest."

Moreover, we think the exclusion created by Section 6(a) is constitutionally problematic because it incorporates a viewpoint-based judgment about what is or is not in the public interest—after all, what is in the public interest necessarily depends upon one's viewpoint.

—Assume, for example, that D.C. Right To Life (RTL) makes public statements that having an abortion causes breast cancer. Assume Planned Parenthood sues RTL, alleging that those statements impede its work and cause psychological harm to its members. RTL files a special motion to dismiss under the Anti-SLAPP Act, showing that it was communicating views to members of the public in connection with an issue of public interest. But Planned Parenthood responds that its lawsuit is not subject to the Anti-SLAPP Act because it was

8

"brought ... solely to enforce an important right affecting the public interest," to wit, the right to reproductive choice.

—Now assume that Planned Parenthood makes public statements that having an abortion under medical supervision is virtually risk-free. RTL sues Planned Parenthood, alleging that those statements impede its work and cause psychological harm to its members. Planned Parenthood files a special motion to dismiss under the Anti-SLAPP Act, showing that it was communicating views to members of the public in connection with an issue of public interest. But RTL responds that its lawsuit is not subject to the Anti-SLAPP Act because it was "brought ... solely to enforce an important right affecting the public interest," to wit, the right to life.

Are both lawsuits exempt from the Anti-SLAPP Act? Neither? One but not the other? We fear that the result is likely to depend on the viewpoint of the judge regarding which asserted right is "an important right affecting the public interest." But the First Amendment requires the government to provide evenhanded treatment to speech on all sides of public issues. We see no good reason for the inclusion of Section 6(a), and many pitfalls. Accordingly, we urge that it be deleted.[8]

Thank you for your consideration of our comments.

---

[8] Section 10 of H.R. 4364, on which Section 6(a) of Bill 18-893 is modeled, begins with the catchline "Public Enforcement." It therefore appears that Section 10 was intended to exempt only enforcement actions brought by the government.

Even if that is true, we see no good reason to exempt the government, as a litigant, from a statute intended to protect the rights of citizens to speak freely on issues of public interest. To the contrary, the government should be held to the strictest standards when it comes to respecting those rights. *See, e.g., White v. Lee*, 227 F.3d 1214 (9th Cir. 2000) (holding that the advocacy activities of neighbors who opposed the conversion of a motel into a multi-family housing unit for homeless persons were protected by the First Amendment, and that an intrusive eight-month investigation into their activities and beliefs by the regional Fair Housing and Equal Opportunity Office violated their First Amendment rights).

We therefore urge the complete deletion of Section 6(a), as noted above. However, if the Committee does not delete Section 6(a) entirely, its coverage should be limited to lawsuits brought by the government.

JUNCILMEMBER MENDELS

## GOVERNMENT OF THE DISTRICT OF COLUMBIA
### Office of the Attorney General



★ ★ ★

**ATTORNEY GENERAL**

September 17, 2010

The Honorable Phil Mendelson
Chairperson
Committee on Public Safety & the Judiciary
Council of the District of Columbia
1350 Pennsylvania Avenue, N.W., Ste. 402
Washington, D.C. 20004

Re:  Bill 18-893, the "Anti-SLAPP Act of 2010"

Dear Chairperson Mendelson:

I have not yet had the opportunity to study in depth Bill 18-893, the "Anti-SLAPP Act of 2010" ("bill"), which will be the subject of a hearing before your committee today, but I do want to register a preliminary concern about the legislation.

To the extent that sections 3 (special motion to dismiss) and 4 (special motion to quash) of the bill would impact SLAPPs filed in the Superior Court of the District of Columbia, the legislation may run afoul of section 602(a)(4) of the District of Columbia Home Rule Act, approved December 24, 1973, Pub. L. 93-198, 87 Stat. 813 (D.C. Official Code § 1-206.02(a)(4) (2006 Repl.)), which prohibits the Council from enacting any act "with respect to any provision of Title 11 [of the D.C. Code]." In particular, D.C. Official Code § 11-946 (2001) provides, for example, that the Superior Court "shall conduct its business according to the Federal Rules of Civil Procedure...unless it prescribes or adopts rules which modify those Rules [subject to the approval of the Court of Appeals]." As you know, the Superior Court subsequently adopted rules of procedure for civil actions, including Rules 12(c) (Motion for judgment on the pleadings), 26-37 (Depositions and Discovery), and 56 (Summary judgment), which appear to afford the parties to civil actions rights and opportunities that sections 3 and 4 of the bill can be construed to abrogate. Thus, the bill may conflict with the Superior Court's rules of civil procedure and, consequently, violate section 602(a)(4) of the Home Rule Act insofar as that section preserves the D.C. Courts' authority to adopt rules of procedure free from interference by the Council. Accordingly, I suggest that – if you have not already done so – you solicit comments concerning the legislation from the D.C. Courts.

Sincerely,

Peter J. Nickles
Attorney General for the District of Columbia

cc: Vincent Gray, Chairman, Council of the District of Columbia
    Yvette Alexander, Council of the District of Columbia

# Government of the District of Columbia
## Office of the Chief Financial Officer



**Natwar M. Gandhi**
Chief Financial Officer

# MEMORANDUM

| | |
|---|---|
| **TO:** | The Honorable Vincent C. Gray<br>Chairman, Council of the District of Columbia |
| **FROM:** | Natwar M. Gandhi<br>Chief Financial Officer |
| **DATE:** | November 16, 2010 |
| **SUBJECT:** | Fiscal Impact Statement – "Anti-SLAPP Act of 2010" |
| **REFERENCE:** | Bill Number 18-893, Draft Committee Print Shared with the OCFO on November 15, 2010 |

## Conclusion

Funds are sufficient in the FY 2011 through FY 2014 budget and financial plan to implement the provisions of the proposed legislation.

## Background

The proposed legislation would provide a special motion for the quick dismissal of claims "arising from an act in furtherance of the right of advocacy on issues of public interest,"[1] which are commonly referred to as strategic lawsuits against public participation (SLAPPs). SLAPPs are generally defined as retaliatory lawsuits intended to silence, intimidate, or punish those who have used public forums to speak, petition, or otherwise move for government action on an issue. Often the goal of SLAPPs is not to win, but rather to engage the defendant in a costly and long legal battle. This legislation would provide a way to end SLAPPs quickly and economically by allowing for this special motion and requiring the court to hold an expedited hearing on it.

In addition, the proposed legislation would provide a special motion to quash attempts arising from SLAPPs to seek personally identifying information, and would allow the courts to award the costs of litigation to the successful party on a special motion.

---

[1] Defined in the proposed legislation as (A) Any written or oral statement made: (i) In connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (ii) In a place open to the public or a public forum in connection with an issue of public interest; or (B) Any other expression or expressive conduct that involves petitioning the government or communicating views to members of the public in connection with an issue of public interest.

Lastly, the proposed legislation would exempt certain claims from the special motions.

**Financial Plan Impact**

Funds are sufficient in the FY 2011 through FY 2014 budget and financial plan to implement the provisions of the proposed legislation. Enactment of the proposed legislation would not have an impact on the District's budget and financial plan as it involves private parties and not the District government (the Courts are federally-funded). If effective, the proposed legislation could have a beneficial impact on current and potential SLAPP defendants.

**COMMITTEE PRINT**

Committee on Public Safety & the Judiciary

November 18, 2010

A BILL

18-893

IN THE COUNCIL OF THE DISTRICT OF COLUMBIA

To provide a special motion for the quick and efficient dismissal of strategic lawsuits against public participation, to stay proceedings until the motion is considered, to provide a motion to quash attempts to seek personally identifying information; and to award the costs of litigation to the successful party on a special motion.

BE IT ENACTED BY THE COUNCIL OF THE DISTRICT OF COLUMBIA, That this act may be cited as the "Anti-SLAPP Act of 2010".

Sec. 2. Definitions.

For the purposes of this act, the term:

(1) "Act in furtherance of the right of advocacy on issues of public interest" means:

(A) Any written or oral statement made:

(i) In connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; or

(ii) In a place open to the public or a public forum in connection with an issue of public interest.

(B) Any other expression or expressive conduct that involves petitioning the government or communicating views to members of the public in connection with an issue of public interest.

(2) "Issue of public interest" means an issue related to health or safety; environmental, economic, or community well-being; the District government; a public figure; or a good, product, or service in the market place. The term "issue of public interest" shall not be construed to include private interests, such as statements directed primarily toward protecting the speaker's commercial interests rather than toward commenting on or sharing information about a matter of public significance.

(3) "Claim" includes any civil lawsuit, claim, complaint, cause of action, cross-claim, counterclaim, or other judicial pleading or filing requesting relief.

Sec. 3. Special Motion to Dismiss.

(a) A party may file a special motion to dismiss any claim arising from an act in furtherance of the right of advocacy on issues of public interest within 45 days after service of the claim.

(b) If a party filing a special motion to dismiss under this section makes a prima facie showing that the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest, then the motion shall be granted unless the responding party demonstrates that the claim is likely to succeed on the merits, in which case the motion shall be denied.

(c)(1) Except as provided in paragraph (2), upon the filing of a special motion to dismiss, discovery proceedings on the claim shall be stayed until the motion has been disposed of.

2

(2) When it appears likely that targeted discovery will enable the plaintiff to defeat the motion and that the discovery will not be unduly burdensome, the court may order that specialized discovery be conducted. Such an order may be conditioned upon the plaintiff paying any expenses incurred by the defendant in responding to such discovery.

(d) The court shall hold an expedited hearing on the special motion to dismiss, and issue a ruling as soon as practicable after the hearing. If the special motion to dismiss is granted, dismissal shall be with prejudice.

Sec. 4. Special Motion to Quash.

(a) A person whose personally identifying information is sought, pursuant to a discovery order, request, or subpoena, in connection with a claim arising from an act in furtherance of the right of advocacy on issues of public interest may make a special motion to quash the discovery order, request, or subpoena.

(b) If a person bringing a special motion to quash under this section makes a prima facie showing that the underlying claim arises from an act in furtherance of the right of advocacy on issues of public interest, then the motion shall be granted unless the party seeking his or her personally identifying information demonstrates that the underlying claim is likely to succeed on the merits, in which case the motion shall be denied.

Sec. 5. Fees and costs.

(a) The court may award a person who substantially prevails on a motion brought under sections 3 or 4 of this Act the costs of litigation, including reasonable attorney fees.

3

(b) If the court finds that a motion brought under sections 3 or 4 of this Act is frivolous or is solely intended to cause unnecessary delay, the court may award reasonable attorney fees and costs to the responding party.

Sec. 6. Exemptions.

This Act shall not apply to claims brought against a person primarily engaged in the business of selling or leasing goods or services, if the statement or conduct from which the claim arises is a representation of fact made for the purpose of promoting, securing, or completing sales or leases of, or commercial transactions in, the person's goods or services, and the intended audience is an actual or potential buyer or customer.

Sec. 7. Fiscal impact statement.

The Council adopts the attached fiscal impact statement as the fiscal impact statement required by section 602(c)(3) of the District of Columbia Home Rule Act, approved December 24, 1973 (87 Stat. 813; D.C. Official Code § 1-206.02(c)(3)).

Sec. 8. Effective date.

This act shall take effect following approval by the Mayor (or in the event of veto by the Mayor, action by the Council to override the veto), a 30-day period of Congressional review as provided in section 602(c)(1) of the District of Columbia Home Rule Act, approved December 24, 1973 (87 Stat. 813; D.C. Official Code § 1-206.02(c)(1)), and publication in the District of Columbia Register.

West's District of Columbia Code Annotated 2001 Edition
  Division II. Judiciary and Judicial Procedure
    Title 16. Particular Actions, Proceedings and Matters. (Refs & Annos)
      Chapter 55. Strategic Lawsuits Against Public Participation.

DC ST § 16-5502

§ 16-5502. Special motion to dismiss.

Effective: September 26, 2012
Currentness

(a) A party may file a special motion to dismiss any claim arising from an act in furtherance of the right of advocacy on issues of public interest within 45 days after service of the claim.

(b) If a party filing a special motion to dismiss under this section makes a prima facie showing that the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest, then the motion shall be granted unless the responding party demonstrates that the claim is likely to succeed on the merits, in which case the motion shall be denied.

(c)(1) Except as provided in paragraph (2) of this subsection, upon the filing of a special motion to dismiss, discovery proceedings on the claim shall be stayed until the motion has been disposed of.

(2) When it appears likely that targeted discovery will enable the plaintiff to defeat the motion and that the discovery will not be unduly burdensome, the court may order that specified discovery be conducted. Such an order may be conditioned upon the plaintiff paying any expenses incurred by the defendant in responding to such discovery.

(d) The court shall hold an expedited hearing on the special motion to dismiss, and issue a ruling as soon as practicable after the hearing. If the special motion to dismiss is granted, dismissal shall be with prejudice.

**Credits**
(Mar. 31, 2011, D.C. Law 18-351, § 3, 58 DCR 741; Apr. 20, 2012, D.C. Law 19-120, § 201, 58 DCR 11235; Sept. 26, 2012, D.C. Law 19-171, § 401, 59 DCR 6190.)

Notes of Decisions (13)

Copyright (c) 2012 By the District of Columbia. Content previously published in the District of Columbia Official Code, 2001 Edition is used with permission. Copyright (c) 2014 Thomson Reuters
DC CODE § 16-5502
Current through February 21, 2014

**Filed**
**D.C. Superior Court**
**06/25/2012 15:54PM**
**Clerk of the Court**

# THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

BRADLEE DEAN, *et al.*,    )
                          )
           Plaintiffs,    )    Case No. 2011 CA 006055 B
                          )    Judge Joan Zeldon
     v.                   )
                          )
NBC UNIVERSAL (NBC), *et al.*,  )
                          )
           Defendants.    )

## MEMORANDUM AND ORDER

The Court has before it (1) Defendants' Motion to Recover Attorneys' Fees and Costs (hereafter "Defendants' Motion"), dated and filed May 7, 2012, (2) Plaintiffs' (combined) Motion for Reconsideration, Opposition to Defendants' Motion to Recover Attorneys Fees, and Cross Motion for Sanctions, dated May 23, 2012 (hereafter "Plaintiffs' Combined Motion"), (3) Defendants' Memorandum of Points and Authorities in Opposition to Plaintiffs' Motions for Reconsideration and Sanctions, filed June 4, 2012, (4) the Court's Orders docketed June 6 and June 12, 2012, (5) Plaintiff's Reply[1] (filed June 11, 2012), (6) the Supplemental Affidavit of Laura R. Handman filed June 18, 2012, and (7) Plaintiffs' Reply to Defendants' Supplemental Affidavit, filed June 22, 2012. The Court will grant Defendants' Motion to Recover Attorneys' Fees and Costs in part and deny Plaintiffs' Motion for Reconsideration and Cross Motion for Sanctions for the reasons set forth below.

---

[1] Plaintiffs have no right to file a Reply because Superior Court Civil Rules do not authorize the filing of a Reply. The correct procedure would have been for Plaintiffs' counsel to file a Motion for Leave to File a Reply, with the proposed Reply attached as an exhibit to the Motion. However, for the sake of completeness in the record, the Court has considered Plaintiffs' Reply.

## *Background*

Defendants' submitted their Motion pursuant to an order of this Court, entered April 23, 2012, which also vacated a Notice of Dismissal that Plaintiff had filed on February 21, 2012.[2] The motive for Plaintiffs' effort to abandon this action seven months after it was filed is to pursue the same claims against the same Defendants in the U.S. District Court for the District of Columbia. *See Dean v. NBC Universal*, 12 cv 00283-RJL.

Plaintiffs wish to discontinue this case and to pursue the same matter in Federal Court because, at the time they filed the praecipe of dismissal, there had been at least one decision by a District of Columbia federal judge holding that D.C. Code § 16-5501, *et seq.*, the District's "Anti-SLAPP Act"[3] violated the Federal Rules of Civil Procedure, and thus was unavailable to a defamation defendant sued in Federal Court.[4] Notwithstanding the fact that this Court was proceeding to address first Defendants' converted Motion for Summary Judgment, Plaintiffs' counsel did not want to have the Anti-SLAPP issue "hanging over our head." Status Hearing of February 17, 2012.

---

[2] The reasons the Court vacated the Praecipe of Dismissal, which was docketed by the Clerk's Office without any ruling by the judge, are set forth in the April 23, 2012 Order. The explanation need not be repeated in this Memorandum and Order.

[3] SLAPP stands for Strategic Lawsuits Against Public Participation.

[4] *See 3M Co. v. Boulter*, Civil No. 11-1527(RLW), 2012 WL 386488 (D.D.C. Feb. 2, 2012) (Wilkins, J.) (finding Anti-SLAPP law to be procedural, and therefore inapplicable to a federal court sitting in diversity under *Erie*). *But see Sherrod v. Breitbart*, Civil Case No. 11-477 (RJL), 2012 WL506729, *1 (D.D.C. Feb. 15, 2012) (Leon, J.) (finding the Anti-SLAPP Act to be "substantive—or at the very least, ha[ve] substantive consequences"), *and Farah v. Esquire Mag., Inc.*, Civil Action No. 11-cv-1179 (RMC), slip op. at 11, n.10 (D.D.C. June 4, 2012) (Collyer, J.) (citing *Sherrod*) ("The Court finds the [substantive] view persuasive. It was certainly the intent of the D.C. Council and the effect of the law—dismissal on the merits—to have substantive consequences."). (The Court notes that Mr. Klayman and Ms. Handman represent the parties—plaintiffs and defendants, respectively—in the *Esquire Magazine* case.)

Anti-SLAPP statutes have been enacted by more than twenty-five states and the District of Columbia. Broadly stated, their avowed purpose is to provide protection at an early stage of civil defamation actions for defendants who claim that their allegedly defamatory statements regarding plaintiffs were made in exercise of their constitutional right of free speech regarding an issue of public interest. Among other provisions, most of these statutes set out an expedited procedure to consider the question of the availability of such a defense, and require the plaintiff to demonstrate a likelihood of success on the merits to keep the court from dismissing the action.

Plaintiffs' claims in this case are for alleged defamations that occurred during MSNBC broadcasts of The Rachel Maddow Show on August 9, 2010, and May 11, 2011. The Rachel Maddow Show, televised nationally five days a week during prime time, is about politics from a liberal perspective. It is not a straight news show in the traditional sense; rather, the show is a running commentary about what is happening in the political realm. Consequently, the District's Anti-SLAPP Act presumably would have facial application to the present case.

On September 9, 2011, Defendants filed a Special Motion to Dismiss Pursuant to the D.C. Anti-SLAPP Act of 2010 and Motion to Dismiss Pursuant to Superior Court Civil Rule 12 (b)(6). On October 7, 2011, Plaintiffs' counsel moved for an extension of time to respond to the motions, and a few days later opposed both motions to dismiss. Both sides filed additional papers, but no Anti-SLAPP Motion hearing was set for 2011 because Plaintiffs' counsel, Larry Klayman, Esq., was living in California and informed the Court that health problems required him to forego travel. During this time, numerous conferences on the record were held via telephone, and a hearing on the record by phone was held on January 24, 2012, also to accommodate Mr. Klayman.

Eventually, the Court set the hearing on Plaintiffs' Anti-SLAPP motion for February 23, 2012. However, because Defendants' motions had been accompanied by an affidavit with numerous attachments from Defendants' counsel that presented material outside the pleadings, the Court converted the pending motion to dismiss into one for summary judgment.[5] This was the posture of the case when, on February 21, 2012, Plaintiffs filed with the Clerk a praecipe purporting to unilaterally dismiss the action—obviously without prejudice.

---

[5] *See* Court Order dated April 23, 2012, for a full recitation of the facts leading up to the conversion of the Motion to Dismiss to a Motion for Summary Judgment.

On February 27, 2012, Defendants filed a Motion to Vacate Plaintiffs' February 21, 2011 Notice of Dismissal.  On April 23, 2012, this Court vacated the notice of dismissal, reinstated the action and entered an order that conditioned a voluntary dismissal of the Complaint without prejudice upon Plaintiffs' payment of reasonable attorneys' fees and costs to cover what cannot be applied to the subsequent lawsuit covering the same claims.  *See Thoubboron v. Ford Motor Co.*, 809 A.2d 1204, 1211 (D.C. 2002).

### *Discussion of Pending Motions*

It is appropriate to first focus on Plaintiffs' Motion for Reconsideration because if the Court were to enter an Order providing what is requested by Plaintiffs, they would not be required to pay any fees or costs in connection with their intended discontinuance of their case before this Court without prejudice.

Plaintiffs' motion claims that they seek to dismiss this action "to avoid parallel claims that would have required both parties to needlessly waste the time and expense required to litigate the same claim in two courts."  Pls. Combined Mots. at 1.  Before Plaintiffs filed the same case in the Federal District Court, there was no risk of a "needless waste of time and expense" owing to the same claim being asserted in two different courts.  It is only the filing of the second action by Plaintiffs in the Federal Court (seven months after they filed this Superior Court case) that created any risk of a "waste of time and expense" that might result from the same claims being litigated before two different courts.

To speak plainly, the Court cannot credit Plaintiffs with their purported reason for seeking to discontinue the action in this Court.  In this context, the Court finds that Plaintiffs' accusations that the Defendants' conduct in this litigation is "a bad faith attempt to further harm

4

Plaintiffs" or that Defendants are engaging in "underhanded and extreme methods of delaying and raising the cost of this litigation"[6] to be a gross and transparent distortion of the record. It is Plaintiffs—not Defendants—who have created the possibility of increased time and expense arising out of duplicate actions, and the certainty that some of the time and expenses that Defendants have experienced, unless reimbursed by Plaintiffs, would be wasted.[7]

Plaintiffs are reminded that the Court's Order conditioning the grant of an Order of Dismissal without prejudice upon payment of certain attorneys' fees and costs was carefully limited to avoid any of the charges allowed by the Court being for work that can be used in the federal action. If Plaintiffs now wish to pursue their claim in a forum they believe is likely to give them a more favorable outcome than what they believe they may obtain from this Court, they may do so. However, their decision to change forums seven months later gives rise to a concomitant obligation to make that change "on their own dime," and not on that of the Defendants, who undoubtedly will continue to fight this dispute before the Federal Court with considerable costs.[8] This Court's Order of April 23, 2012, requiring Plaintiffs, as a condition of dismissal without prejudice, to pay the additional costs for work that cannot be used in the federal case is eminently fair and reasonable. It will not be modified.

Turning now to Defendants' Motion, the Court finds that with only a few exceptions, the requested fees and costs are reasonable. From Defendants' perspective, this case involves a

---

[6] Pls.' Combined Mots. at 2.

[7] The Court notes that *Plaintiffs* would raise the cost of the Superior Court litigation by deposing attorneys about timesheets submitted to this Court.

[8] Plaintiffs argue that they have "few resources" and that "it would be a manifest injustice to assess punitive damages and attorneys' fees and costs" against them. However, they have created this "problem" for themselves by choosing to litigate before this Court for seven months and then changing to what they apparently perceive to be a more favorable forum. Having created this dilemma, they cannot reasonably be excused for the consequences of their actions. Moreover, the purpose of the Court's order to pay reasonable attorneys' fees and costs is not to punish but to compensate and to avoid having the Court's processes be used by a party so as to unnecessarily increase the costs of litigation.

serious attack on their First Amendment rights.  They had every right to retain distinguished counsel to defend them.  The Laffey Index rates that Defendants' lead counsel has used to justify Defendants' fee request are very reasonable.  The Court notes that Defendants did not even request fees for corporate in-house counsel, who did much of the work.

The only requested fee for work that the Court will disallow is twenty minutes spent on August 16, 2011, to "find and send sample corporate disclosures and proposed orders to Ms. Talbert."  Plaintiffs have informed the Court that the same corporate disclosure form was used in the federal action, and consequently, the Court will disallow this particular request.

The only costs disallowed are the two $20-each taxi costs requested for ground transportation in October 2011 and November 2011.

Wherefore, it is this 25th day of June, 2012, hereby

**ORDERED**, that Defendants' Motion to Recover Attorneys' Fees and Costs in hereby **GRANTED IN PART**; and it is further

**ORDERED**, that Plaintiffs shall pay Defendants $24,625.23 in attorneys' fees and costs within thirty days of the docketing date of this Order; and it is further

**ORDERED**, that the case will remain open until August 3, 2012, because a failure to pay these Court-ordered costs will lead to a dismissal with prejudice; and it is further

**ORDERED**, that Plaintiffs' Motion for Reconsideration and Cross Motion for Sanctions is **DENIED**.

Joan Zeldon
Senior Judge
(Signed in Chambers)

Copies to:

Larry Klayman, Esq.
2020 Pennsylvania Avenue, N.W., No. 345
Washington, D.C.  20006
*Counsel for Plaintiffs*

Susan Weiner, Esq.
Chelley E. Talbert, Esq.
NBC UNIVERSAL MEDIA, LLC
30 Rockefeller Plaza
New York, New York  10112

Laura R. Handman, Esq.
John R. Eastburg, Esq.
DAVIS WRIGHT TREMAINE, LLP
1919 Pennsylvania Avenue, N.W.
Suite 800
Washington, D.C.  20006

*Counsel for Defendants NBC Universal,*
 *MSNBC and Rachel Maddow*

**CERTIFICATE OF SERVICE**

I certify that on April 2, 2014, electronic copies of this brief were served through the Court's ECF system, to:

Louis G. Adolfsen
S. Dwight Stephens
Melito & Adolfsen PC
233 Broadway
New York, New York 10279
(212) 238-8900
*Counsel for Yasser Abbas*

Kevin T. Baine
Adam R. Tarosky
James M. McDonald
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, DC 20005
202-434-5000
*Counsel for Foreign Policy Group, LLC*

Nathan E. Siegel
Seth D. Berlin
Shaina J. Ward
Levine Sullivan Koch & Schulz LLP
1899 L Street N.W.
Suite 200
202-508-1100
*Counsel for Jonathan Schanzer*

/s/ Ariel B. Levinson- Waldman
ARIEL B. LEVINSON-WALDMAN
Senior Counsel to the Attorney General

## CERTIFICATE OF COMPLIANCE

I further certify that this brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief contains 6,999 words, excluding exempted parts. This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in Times New Roman 14 point.

/s/ Ariel B. Levinson- Waldman
ARIEL B. LEVINSON-WALDMAN
Senior Counsel to the Attorney General